(940 P.2d 1158)
No. 74,515

MLK, Inc., d/b/a Metro Construction Associates, *Appellant*,
v. University of Kansas and State of Kansas, *Appellees*.

—

Opinion filed February 28, 1997.

*Ronald K. Barker*, of Kansas City, Missouri, and *John D. Dunbar*, of Daniels & Kaplan, P.C., of Kansas City, Missouri, for the appellant.

*Christopher F. Burger* and *Nancy L. Ulrich*, assistant attorneys general, *Karen A. Dutcher*, special assistant attorney general, and *Carla J. Stovall*, attorney general, for the appellees.

Before ROYSE, P.J., PIERRON, J., and DEAN SMITH, District Judge Retired, assigned.

PIERRON, J.: MLK, Inc., d/b/a Metro Construction Association (Metro) appeals the district court's granting of summary judgment in favor of the University of Kansas and the State of Kansas (collectively referred to as "KU"), in this breach of construction contract case. Metro argues the district court: (1) improperly applied the statutes, rules, and standards governing summary judgment; (2) granted summary judgment on an issue of fact of its damages; and (3) erred in finding that Metro breached the contract.

On March 6, 1991, KU and Metro entered into a construction contract for the renovation of the Pearson Scholarship Hall (Pearson Hall) on the KU campus in Lawrence, Kansas. The contract price was $497,532. The contract expressly provided that Metro understood and agreed to "the date of beginning and the time for completion as specified in the Contract of the work to be done hereunder are ESSENTIAL CONDITIONS of this Contract." General construction was to begin on May 17, 1991, and be substantially complete by August 10, 1991. Construction on an elevator and elevator shaft was to commence on April 8, 1991, and be substantially completed on or before September 25, 1991.

Marc McFarland, vice-president and shareholder of Metro, testified that Metro subcontracted nearly 90% of the work. With regard to Metro's responsibilities, he said it was in change of demolition, rough carpentry, finish carpentry, exterior concrete, clean up, installation of doors, frames and hardware, installation of signage, mirrors, toilet partitions, and toilet accessories.

The Manual of Policies and Procedures (manual) published by the State's Division of Architectural Services was applicable to the project. Metro states that despite a list of requirements in the manual, the Project Manager, Jim Modig, did not perform the required tasks. Modig testified in his deposition he delegated the on-site details of the construction to Doug Riat, whom Modig supervised and who brought project progress changes and documents to Modig's attention. Riat was the construction manager for KU and had a Bachelor of Science degree in architectural engineering from Kansas State University.

In a letter dated May 1, 1991, Metro applied for a rain delay claiming they had lost 16 out of the last 23 days due to rain. Riat responded to Metro in a letter dated May 7, 1991. The letter stated Riat had checked with the KU weather service and accounted for 5 rain days with an additional day having a trace of rain. Riat also explained to Metro that any request for an extension of contract time must be made on a monthly basis and must itemize the dates in which the delay occurred. The claim would then be reviewed and either approved or denied. Riat also expressed concern over Metro's progress on the project.

The construction contract stated: "The Contractor shall submit with his proposal his request for time extension or reduction (if any) and shall include sufficient information and dates to substantiate such claim." The construction contract also provided in section 17D:

"Provided, further, that the Contractor shall, within ten (10) days from the beginning of such delay, unless the Architect/Engineer shall grant a further period of time prior to the date of final settlement of the Contract, notify the Owner, in writing, of the causes of the delay, who shall ascertain the facts and extent of the delay and notify the Contractor within a reasonable time of his decision in the matter."

Riat stated in his deposition that he gave no extension for rain days because the 5 days documented with the KU weather service did not exceed the 5-year average for the month of April in the area. He also stated that if there were causes for delay beyond Metro's control, he needed to discuss any extensions with the KU Housing Department.

On July 10, 1991, Metro wrote a letter to Riat explaining Metro had received the schedule from KU for the project. Metro indicated their scheduling firm examined the progress of the project and Metro in turn informed KU the basement of Pearson Hall would be the only part of the project running past the August 10, 1991, deadline and that would only be by several days. Metro expressed confidence it would be able to meet the contract deadline.

On July 18, 1991, Metro changed its position with regard to the completion date. Metro stated that from May 17, 1991, through July 15, 1991, it received 31 requests for proposed changes to the

original scope of the project. Metro admitted many of the changes were minor, but the fire dampers for example, affected the completion schedule. Metro requested a 12-day extension for completion claiming it was not the party requesting changes and any delays were due to unforeseeable causes beyond their control. Metro also requested additional monies for the extended time period.

On July 25, 1991, Riat rejected Metro's request for a 12-day extension. Riat stated the changes in the project were mostly field directives to simplify Metro's work and the work had proceeded immediately. He stated that until Metro could show that KU's changes alone delayed the project, time extensions would be rejected. KU eventually approved 12 changes found in change orders No. 3 & 4. KU did not extend the completion time based on the fact that the changes did not affect the overall project schedule. In a letter dated August 5, 1991, Riat again explained to Metro it must definitively show how each individual proposal delayed the project otherwise any time extension would be rejected.

On August 5, 1991, Metro submitted Application No. 4 for payment in the amount of $105,228.72. KU did not immediately process this application and terminated the construction contract with Metro on or about August 15, 1991, for not having the project substantially completed by August 10, 1991. Metro signed over the remainder of its contract balances on the project to Metro's bonding company, American Bonding Company. KU reduced Application No. 4 to $53,359.29 and paid American Bonding on or about January 2, 1992.

KU paid Metro on three out of four applications for payment, and according to McFarland, Metro kept at least $60,000 paid by KU which Metro owed its subcontractors.

On March 2, 1992, Metro filed a petition for damages against KU and the State of Kansas alleging claims of breach of contract (Count I), quantum meruit (Count II), and restitution (Count III). Metro claimed KU wrongfully terminated it from the contract and KU had in fact breached the contract by: (1) providing deficient and defective plan specifications; (2) not paying Metro for performance of extra work; (3) failing to recognize and compensate Metro for differing site conditions; (4) not granting time extensions

for excusable delays; and (5) failing to pay Metro for labor and materials furnished to the project.

Metro claimed damages in the following amounts: (1) breach of contract—$281,810.21 plus consequential damages for loss of bonding capacity and loss of profits; (2) quantum meruit—$322,018.85 for the cost of Metro's work and profit from the beginning of project through August 30, 1991; (3) restitution—$292,071.10 for Metro's work from the beginning of the project through August 30, 1991.

The largest controversy and main source of confusion and complexity in this case revolves around Metro's claim for loss of profits as a result of being terminated from the Pearson Hall project. In an amended answer to interrogatories, Metro claimed loss of profits in the amount of $431,000 per year for the time period of 4 months in 1991, all of 1992 and 1993, and 10 months of 1994, plus $36,417 per month for 42 months for the 3.5 years of rebuilding necessary to restore Metro's reputation. Metro also claimed damages in an Internal Revenue Service (IRS) debt of approximately $70,000, a default on a Small Business Administration (SBA) loan for $109,750, and reimbursement for all payments made to its surety, American Bonding. The total damages claimed by Metro was $3,587,816.81.

Marvin Birnbaum, Metro's accountant and damages expert, testified in his deposition as to Metro's loss of profits. Birnbaum estimated Metro would require 3.5 years to rebuild itself in the construction community because of the Pearson Hall fiasco. He stated Metro's termination destroyed its ability to obtain future surety bonds, which are obtained based upon a contractor's financial position.

Birnbaum testified he estimated Metro's lost profits at approximately $437,000 each year since August of 1991 after the Pearson Hall project. He based his opinion on projections of growth since the outset of Metro's business and what profits would have been had the growth continued during the period of Metro's rebuilding. However, Birnbaum testified he was not aware Metro had indemnity obligations with American Bonding in an amount close to $480,000, of which $100,000 had nothing to do with the project.

Additionally, he also testified the $437,000 figure probably represented gross profits with operating expenses or administrative expenses and taxes still coming out of that figure in order to represent net profit.

In an accountant's review report, Birnbaum's statements show a net profit of $30,493.64 for 1989. However, in a financial report on final review, Birnbaum's statements show a profit of $25,553.64 for 1989. Yet, McFarland's income tax statements show a business *loss* for 1989 of $13,296.00. Birnbaum testified the reason for the discrepancies in the 1989 statements and McFarland's tax declaration was computation of profits on an accrual basis verses a cash basis. Birnbaum used an accrual basis to figure the financial statement amount, which represented income Metro had earned but not received money for yet. On the other hand, he used a cash basis to figure the tax statement, which depicted only the income Metro had actually received money for. He said this wiped out the accounts receivable and accounts payable.

McFarland testified Metro did $300,000 worth of business at a 17% to 18% profit margin in 1989; $900,000 worth of business at a 26% profit margin in 1990; and prior to termination in 1991, Metro had done $1.4 million in business. He estimated $437,000 gross profit per year after 1991 and after taxes he estimated a net profit of $300,000 to $350,000. McFarland conceded he had not taken his general administrative expenses, approximately 7% to 8%, out of the $437,000. He based his $437,000 gross profit figure on the financial statements of 1989-1991. He stated the financial statements for 1989 and 1990 showed a trend of growth and profitability and the financial statement for August 1991 demonstrated $437,000 in profit.

An accountant hired by KU, James Clinkinbeard, reviewed Metro's lost profit figures and testified a more realistic number for Metro's profits in 1991 could be obtained by using the end of the year gross and net profit figures, showing a gross profit of 11.8% and net profit of 3.6%.

In an exhaustive decision, the district court granted summary judgment in favor of KU. In addressing Metro's proof of damages, the court held Metro provided so many different calculations that

it was virtually impossible to determine which figures actually represented Metro's projected loss of future profits following the Pearson Hall project. The court found Metro's evidence of damages to be problematic, speculative and not shown with any degree of reasonable certainty.

More importantly, the district court also concluded any loss of future profits due to Metro's inability to obtain surety for future construction contracts did not arise, in the usual course of things, solely from Metro's termination from the Pearson Hall project. The court found Metro had indemnity obligations to both American Bonding Company and TransAmerica Insurance Company as a result of projects unrelated to the Pearson Hall project, and TransAmerica had even refused to bond Metro because of those unrelated obligations.

Therefore, Metro's failure to obtain bonding due to KU's action could not be proved with reasonable certainty and, hence, the failure of Metro's business was not a foreseeable consequence of a possible breach of contract in the Pearson Hall project which the parties contemplated when entering the contract.

The district court also denied Metro's claim of consequential damages for past due tax withholdings for failure to pay the IRS and a SBA loan accepted after Metro was no longer bidding for any new work. The court found a release of levy indicated Metro was no longer liable for the IRS debt and Metro had ample opportunity to avoid liability for the SBA loan, but failed to do so.

The district court also found that even if Metro could have proven its damages with reasonable certainty, it was undisputed that Metro clearly breached the contract prior to its termination from the Pearson Hall project. The court found the contract expressly stated the completion date was an essential condition of the contract because the students would need to occupy the Hall before classes started. The court found Metro was not in a position, almost from the beginning, to complete the contract by the required date and did not follow the proper procedures required by the contract for requesting time extensions. Therefore, as a result of its own breach, Metro could not hold KU or the State liable for any damages resulting from the termination.

Metro first argues the district court improperly applied the statutes, rules, and standards governing summary judgment.

Our standard of review for cases decided on summary judgment is well established:

"The burden on the party seeking summary judgment is a strict one. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal we apply the same rule, and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260-61, 891 P.2d 435 (1995).

The first summary judgment procedural error claimed by Metro is that KU and the State did not file any pleadings, depositions, answers to interrogatories or affidavits to support their joint motion for summary judgment. Instead, Metro claims KU furnished the district court, in chambers but not filed with the clerk of the district court, with a volume entitled "Depositions and Exhibits" which the court subsequently relied upon in granting the summary judgment motion. Metro argues the "Deposition and Exhibits" volume was not on file as required by K.S.A. 60-256(c) and Supreme Court Rule 141 (1996 Kan. Ct. R. Annot. 162), and the district court erred in relying on same.

The appellate record contains a volume entitled, "Deposition Transcripts and Exhibits." It is assumed this is the same volume Metro takes issue with, which it has called "Depositions and Exhibits," since Metro provides no cites to the appellate record in support of its argument.

The record indicates the volume entitled "Deposition Transcripts and Exhibits" was file-stamped in Shawnee County District Court, Division 11, on December 9, 1994, at 3:21 p.m. The case appearance docket also indicates both a motion for summary judg-

ment and a memorandum in support thereof with attachments were filed on December 9, 1994. Metro provides no authority to the contrary. Metro's argument fails.

The next procedural error claimed by Metro is the district court's decision that Metro, not KU, breached the contract and therefore Metro was not entitled to claim any damages.

Metro acknowledges the well-recognized authority permitting the district court to dispose of a case on summary judgment by its own motion. In *Phillips v. Carson*, 240 Kan. 462, Syl. ¶ 3, 731 P.2d 820 (1987), the court stated:

> "A trial court has the inherent authority to summarily dispose of a matter on its own motion where there remains no genuine issue as to any material fact, and, giving the benefit of all reasonable inferences that may be drawn from the evidence, judgment must be for one of the parties as a matter of law."

Metro also cites *Missouri Medical Ins. Co. v. Wong*, 234 Kan. 811, 816, 676 P.2d 113 (1984), and *Green v. Kaesler-Allen Lumber Co.*, 197 Kan. 788, 789-90, 420 P.2d 1019 (1966), as demonstrating the district court's authority. However, Metro argues these three cases are distinguishable because the case at hand presented no confession of any issue (*Phillips*—plaintiff confessed judgment for the amount owed), no hearing on the motion for summary judgment (*Missouri Medical Ins.*—verbal motion for summary judgment at trial), and no pretrial conference (*Green*—summary judgment logically followed pretrial conference where no disputed facts).

Metro contends it prepared its memorandum in opposition to defendant's motion for summary judgment solely in response to KU's motion for summary judgment which was expressly limited to damage issues. Very telling is KU's limiting statement in its memorandum in support of summary judgment: "However, for purposes of summary judgment defendants only present uncontroverted facts on the issue of damages as the issue . . . is most amenable to judgment as a matter of law."

KU does not even address its limiting statement in its briefs on appeal. It appears KU attempted to limit the scope of its summary judgment motion to damages, but since the district court went ahead and found Metro breached the contract, KU did not object.

KU directs the court's attention to nine uncontroverted facts in its motion for summary judgment which concerns Metro's breach of contract. KU also points out Metro's response sets forth 23 pages of controverted statements of how these nine facts were disputed. KU insists Metro denied its own breach and tried to characterize KU as the breaching party. In any event, KU argues the district court was entitled to raise the issue of breach of contract on its own motion based on the evidence presented by the parties.

In addressing the breach of contract issue, Metro argues the district court must not have considered its contentions of incomplete plans and specifications, KU's noncompliance with the manual of policies and procedures, KU's failure to make payment pursuant to the contract, and KU's inflexible position to not extend the contract completion date for any reason.

We find that this portion of the district court's decision cannot stand. Not only did KU not raise this issue in its summary judgment motion, there appear to be disputed material facts. Therefore, the portion of the decision finding Metro breached the contract, and KU did not, must be reversed.

We do believe the court correctly ruled on the issue of the consequential damages.

KU cites several authorities on the issue of proving lost profit damages with reasonable certainty. See *Venable v. Import Volkswagen, Inc.*, 214 Kan. 43, 50, 519 P.2d 667 (1974) (damaged party must not only show injury sustained, but also must show with reasonable certainty the amount of damages suffered from breach). "The issue of damages should not be submitted to the jury if no evidence has been presented to support an award of damages. [Citation omitted.]" *Enlow v. Sears, Roebuck & Co.*, 249 Kan. 732, 740, 822 P.2d 617 (1991).

KU has properly set forth a three-part test, established through fundamental contract principles and lost profit caselaw, in order to allow a party to recover lost profit damages. First, the lost profits must have been contemplated at the time of contracting. Second, the lost profits must proximately result from a breach or termination of the contract. Third, the lost profits must be shown with a reasonable degree of certainty. KU argues Metro cites no cases

supporting its compliance with these three requirements and, therefore, the district court correctly granted summary judgment in its favor.

Applying these requirements, KU first states that in order to allow loss of profit damages, the court must find that when KU signed the Pearson Hall contract, they contemplated the possibility of paying approximately $3.5 million in damages to Metro and that $3.5 million in lost future profits "naturally flowed" from Metro's termination from the Pearson Hall project. KU argues the Pearson Hall contract does not provide for such damages and Metro has provided no evidence to the contrary. Metro argues the district court erred when it considered the foreseeability of consequential damages at the time of contracting rather than at the time of breach.

Kansas courts have long followed the rule of *Hadley v. Baxendale*, 9 Ex. 341, 156 Eng. Rep. 145, 5 Eng. Rul. Cas. 502 (1854), which states breach of contract damages "are limited to those damages which may fairly be considered as arising in the usual course of things, from the breach itself, or as may reasonably be assumed to have been within the contemplation of both parties as the probable result of the breach." *Kansas State Bank v. Overseas Motosport, Inc.*, 222 Kan. 26, 27, 563 P.2d 414 (1977).

In the case at bar, the district court set forth the Restatement (Second) of Contracts § 351 (1979) to address the natural flow of damages. It provides:

"§ 351. Unforeseeability and Related Limitations on Damages

"(1) Damages are not recoverable for loss that the party in breach did not have reason to foresee as a probable result of the breach when the contract was made.

"(2) Loss may be foreseeable as a probable result of a breach because it follows from the breach

(a) in the ordinary course of events, or

(b) as a result of special circumstances, beyond the ordinary course of events, that the party in breach had reason to know.

"(3) A court may limit damages for foreseeable loss by excluding recovery for loss of profits, by allowing recovery only for loss incurred in reliance, or otherwise if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."

KU argues § 351 reemphasizes the established principle that lost profits must be foreseeable to the parties at the time of contracting and that Metro's $437,000 in lost profits would give Metro "disproportionate compensation."

In granting summary judgment, the district court correctly held Metro's failure to get bonding after the Pearson Hall project and the subsequent failure of Metro's business were not foreseeable consequences of a possible breach of the construction contract.

There is considerable doubt whether Metro's termination from the Pearson Hall project resulted in the loss of its surety contracts or its future bonding capabilities. The district court correctly recognized this causation problem with Metro's lost profit damage claim.

The court in *Apperson v. Security State Bank*, 215 Kan. 724, Syl. ¶ 7, 528 P.2d 1211 (1974), stated: "Damages claimed which were not the proximate result of the breach of contract and those which are remote, contingent and speculative in character cannot serve to support a judgment." This court in *Source Direct, Inc. v. Mantell*, 19 Kan. App. 2d 399, 409, 870 P.2d 686 (1994) stated: "Reliance damages, as with any other type of damages, must be the proximate result of the breach of contract, and damages which are remote, contingent, and speculative in character cannot serve to support a judgment. [Citation omitted.]"

McFarland conceded Metro had been sued and its bond terminated by TransAmerica Insurance Company on projects preceding and unrelated to the Pearson Hall project. Furthermore, American Bonding submitted claims to Metro for payments on four other projects on which the owners had filed claims with American Bonding for Metro's defective work. The district court held Metro's claim of damages for failing to obtain future bonding did not arise, in the usual course of things, solely from Metro's termination from the Pearson Hall project. We agree.

The district court also ruled correctly in regard to Metro's claims for damages for the SBA loan and the IRS lien. Metro is no longer liable on the IRS tax lien as evidenced by the release of levy. Additionally, the record supports the district court's finding that the SBA loan was accepted by Metro in November 1991, after Metro

was no longer bidding for any new work. In the SBA action in U.S. District Court, the court found it uncontroverted that Metro "[o]n or about November 15, 1991, . . . executed and delivered to the North Plaza State Bank a promissory note whereby defendant agreed to pay the bank the sum of Eighty-Five thousand and no/100 Dollars ($85,000) with interest at the rate of Ten (10%) per annum on the unpaid balance until paid."

The district court held Metro had ample opportunity to avoid assuming liability for the SBA loan and failed to do so. The court cited *First Nat'l Bank v. Milford*, 239 Kan. 151, 158, 718 P. 2d 1291 (1986), which stated: "[R]ecovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable effort without undue risk, expense or humiliation."

Affirmed in part, reversed in part, and remanded for further proceedings consistant with this opinion.