(140 P.3d 1034)
No. 94,115

MAURYA J. MCLELLAN, f/k/a MAURYA J. LYONS, *Appellant*, v. DONALD RAINES, CAROLE RAINES, REECE & NICHOLS REALTORS, INC., SUE BOCKELMAN, and MARY FATE, *Appellees*.

2

Opinion filed March 31, 2006.

*James D. Griffin* and *Jason R. Scheiderer*, of Blackwell Sanders Peper Martin LLP, of Kansas City, Missouri, for appellant.

*H. Reed Walker*, of Law Offices of H. Reed Walker, of Mission, and *William C. Partin* and *Matthew K. Partin*, of Partin & Partin, P.C., of Kansas City, Missouri, for appellees Donald and Carole Raines.

*Robert S. Caldwell*, of Caldwell & Moll, LC., of Overland Park, for appellees Reece & Nichols Realtors, Sue Bockelman, and Mary Fate.

Before GREEN, P.J., MCANANY, J., and BRAZIL, S.J.

BRAZIL, J.: Maurya McLellan, formerly known as Maurya Lyons, resides at 9727 Canterbury in Overland Park, a residence she purchased from Donald and Carole Raines in 2001. At the time of the sale, the Raines had lived in the house since 1966. Both Sue Bockelman and Mary Fate are real estate agents for Reece & Nichols Realtors (RNR); Fate was McLellan's real estate agent during the purchase of her home, and Bockelman was the Raines' agent. Because both sides of the transaction were from Reece & Nichols Realtors, McLellan and the Raines entered into an agency brokerage disclosure addendum.

With Bockelman's assistance, the Raines each signed a disclosure statement on March 26, 2001; by completing the disclosure statement, they agreed that the document was a "disclosure of seller's knowledge of the condition of the property as of the date signed by seller." In April 2001, the Raines agreed to sell their property to McLellan, and the parties entered into a residential real estate sale contract. The contract included and incorporated, among other attachments, the disclosure statement. The contract provided that "this contract shall not be effective until seller completes and buyer signs a Seller's Disclosure—Statement of Condition for the property."

By its own terms, the disclosure statement provided that it was material to the parties' sale contract and was "an integral part of the agreement between seller and buyer." The disclosure statement was the complete list of representations made by the Raines regarding the property, and the Raines agreed to "promptly notify listing agent, in writing, if any information set forth in this disclosure changes prior to closing."

In section 8 of the disclosure statement entitled "Structural, Basement and Crawl Space Items," the Raines were asked if they were aware of "any water leakage or dampness in the house, crawl space or basement." In response to this question in the disclosure statement which they had signed and initialed, the Raines represented that they were not aware of any water leakage or dampness in the basement. Donald Raines stated that at the time, he told

Bockelman that there was not water leakage to the foundation and that the response on the disclosure statement was correct.

Closing was on May 31, 2001; McLellan had paid the full purchase price and the Raines delivered possession of the property to her. The parties never signed a written agreement modifying or attempting to modify the disclosure statement or the sale contract. The disclosure statement included this provision which McLellan signed:

"Buyer's Acknowledgment and Agreement

"1. I understand and agree that the information in this form is limited to information of which SELLER has actual knowledge, and that SELLER need only make an honest effort at fully revealing the information gathered.

"2. This Property is being sold to be without warranties or guarantees of any kind by SELLER or BROKER concerning the condition or value of the Property.

"3. I agree to verify any of the above information, and any other important information gathered by SELLER or BROKER (including information obtained through the multiple listing service) by an independent investigation of my own. I have been specifically advised to have the Property examined by professional inspectors.

"4. I acknowledge that neither SELLER nor BROKER is an expert at detecting or repairing physical defects in the Property.

"5. I specifically represent that there are no important representations concerning the condition or value of the Property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them."

Additionally, the disclosure statement began with the following language:

"Notice to Buyer: This is a disclosure of SELLER's knowledge of the condition of the property as of the date signed by SELLER and is not a substitute for any inspections or warranties that BUYER may wish to obtain. It is not a warranty of any kind by SELLER or a warranty or representation by the BROKER(S) or their agents."

McLellan relied upon the disclosure statement when she purchased the property. As part of the sale contract, McLellan was permitted to conduct inspections on the property to ascertain its condition. At the recommendation and through the coordination of her agent Fate, McLellan hired a residential inspection business, Pillar to Post, or J&J Home Inspection, to inspect the property prior to the sale. The purpose of the inspection was to provide

McLellan an unbiased opinion regarding the condition of the property and provide an accurate report that she could rely on during her purchase.

J&J conducted a whole house inspection of the Raines' property and inspection involving both a mechanical and structural component. The inspection took approximately 2 hours and 30 minutes. McLellan was present for most of the inspection and arrived 30 to 45 minutes after it began. Because he had been informed of repairs done in the basement, J&J spent "quite a bit of time" looking at these repairs and looking for any signs of water entry or water damage. J&J found no evidence of damage to the unfinished basement or foundation walls and no evidence of water entry or water damage to the property. J&J did not refer McLellan to a structural engineer because his inspection found no structural concerns.

J&J completed a written inspection report detailing the condition of the property and provided it to McLellan the day of the inspection. J&J went over the contents of the report with McLellan and informed her that the repairs performed by Grant Renne in the basement appeared to be "holding." McLellan acknowledged relying on the inspector to assess the actual condition of the property in her deposition. After reviewing the inspection report, McLellan noted several "unacceptable conditions," a result of which the contract allowed her several options: (1) accept the property "as is"; (2) cancel the contract; or (3) offer to negotiate the price and/or other terms with the Raines.

Rather than terminate the contract, McLellan indicated on the inspection report those areas that she was requiring the Raines to repair by placing a star on the report summary contained on the first two pages of the report next to the following items: (a) driveway—repair crack; (b) repair crack in front of house (in the foundation wall, to reduce chance of leaks); (c) electrical wiring; (d) install GFCI electrical receptacle; (e) fix cracked window pane; and (f) clean gutters and clean chimney. The Raines agreed to repair three of the items but not the driveway or the foundation wall. As a result, the Raines agreed to lower the purchase price by $4,500. Prior to closing, the Raines had the agreed-upon repairs completed

and McLelland reviewed the repairs before closing on May 31, 2001.

Shortly after McLellan took possession of the property, water began to leak into the basement. McLellan filed suit against the Raines, Fate, Bockelman, and Reece & Nichols Realtors under theories of breach of contract, negligent misrepresentation, fraud by omission, and the Kansas Consumer Protection Act (KCPA).

All parties filed for summary judgment. The trial court granted summary judgment to the defendants on all counts against them. The court found several genuine issues of material fact remained, among them whether: (1) McLellan would consider homes with prior leakage unless they were accompanied by a warranty; (2) she could have discovered the problem with reasonable diligence; and (3) the defendants, particularly Bockelman, had knowledge of material facts which McLellan did not have nor could have discerned by exercising due diligence. Despite these findings, however, the court concluded that due to the buyer's acknowledgment and agreement that McLellan signed, she had failed to prove an essential element of each of her claims.

McLellan appeals the trial court's order granting summary judgment to the defendants on all of her claims. We affirm.

## Breach of contract claim

The district court dismissed McLellan's breach of contract claim against Donald and Carole Raines for two reasons: (1) She had signed the buyer's acknowledgment which the court interpreted as a waiver of her right to rely on the Raines' representations; and (2) she had failed to prove damages, a required element of the claim. McLellan asserts summary judgment in favor of the Raines was improper because the district court misinterpreted the buyer's acknowledgment; she, in fact, relied on the Raines' statement in the disclosure statement; and she suffered damages as a result of their representation and alleged breach.

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all

facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002).

As the court stated, " '[a] Defendant is entitled to summary judgment if the Defendant can establish the absence of evidence necessary to support an essential element of the Plaintiff's case.' " See *Saliba v. Union Pacific R.R. Co.*, 264 Kan. 128, 131, 955 P.2d 1189 (1998). Further, " ' "a complete failure of proof concerning an essential element of the nonmoving parties' case necessarily render all other facts immaterial." ' " See *Crooks v. Greene*, 12 Kan. App. 2d 62, Syl. ¶ 2, 736 P.2d 78 (1987). But, the party opposing the motion " 'is to be given the benefit of all reasonable inferences to be drawn from the evidentiary matter and all facts asserted by the party opposing the motion and supported by affidavits or other evidentiary material must be taken as true.' " *Brown v. Wichita State University, P.E.C., Inc.*, 217 Kan. 661, 665, 538 P.2d 713 (1975).

"The primary rule in interpreting written contracts is to ascertain the intent of the parties." *Liggatt v. Employers Mut. Casualty Co.*, 273 Kan. 915, 921, 46 P.3d 1120 (2002). Where contract terms are plain and unambiguous, the intention of the parties and the meaning of the contract are determined from the contract itself. *Gray v. Manhattan Med. Center, Inc.*, 28 Kan. App. 2d 572, 580, 18 P.3d 291 (2001).

Paragraph 5 of the buyer's acknowledgment reads: "I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them." The district court interpreted paragraph 5 as imposing no obligations on the Raines. "Had McLellan wanted to subject them to liability, she should have sought another writing which set forth those representations upon which she

wanted to rely as she was instructed in paragraph five of the Buyer's Acknowledgment."

McLellan argues this interpretation was erroneous and that the representations need not be in a separate writing because they are already contained in the disclosure statement. Although the language does not suggest a separate writing is required, the district court's interpretation is not erroneous. The unambiguous language of paragraph 5 clearly directs McLellan to either indicate which representations she was relying on or agree to rely on none of them. She did not so indicate and thus waived her right to rely on the Raines' representations in the disclosure statement.

The district court also found McLellan had offered no proof of damages resulting from the alleged breach and had thus failed to prove a required element of her contract claim. McLellan now asserts she proved she suffered damages and that the district court and several defendants admitted as much. The district court did not elaborate on its ruling but stated simply McLellan "cannot show damages *resulting from any alleged breach.*" (Emphasis added.) This conclusion is presumably based on its finding that the buyer's acknowledgment did not impose any obligations on the Raines.

"Reliance damages, as with any other type of damages, must be the proximate result of a breach of contract, and damages which are remote, contingent, and speculative in character cannot serve to support a judgment." *MLK, Inc. v. University of Kansas*, 23 Kan. App. 2d 876, Syl. ¶ 5, 940 P.2d 1158 (1997). Because McLellan released the Raines from any obligation to disclose adverse information on the disclosure statement and agreed not to rely on their statements therein, any false statement did not constitute a breach of contract. Any damages McLellan suffered, therefore, were not the proximate result of a breach of contract.

Moreover, as the defendants repeatedly point out, McLellan received notice of the "chance of leaks" due to a crack in the house's foundation in her initial inspection by J&J Home Inspection well before closing. "Recovery will not be allowed for damages that a party should have foreseen and could have avoided by reasonable

effort without undue risk, expense, or humiliation." *MLK, Inc.*, 23 Kan. App. 2d 876, Syl. ¶ 6.

The district court properly sustained the Raines' motion for summary judgment on McLellan's breach of contract claim.

## *McLellan's fraud claim*

McLellan next argues the trial court improperly granted the defendants' motions for summary judgment on her fraud by omission claim, arguing genuine issues of material fact remained as to all defendants and attempting to distinguish the body of law the district court used to conclude she could not prove the element of justifiable reliance.

To establish fraud by silence, McLellan must show by clear and convincing evidence the following elements:

"(1) that defendant had knowledge of material facts which plaintiff did not have and which plaintiff could not have discovered by the exercise of reasonable diligence; (2) that defendant was under an obligation to communicate the material facts to the plaintiff; (3) that defendant intentionally failed to communicate to plaintiff the material facts; (4) that plaintiff justifiably relied on defendant to communicate the material facts to plaintiff; and (5) that plaintiff sustained damages as a result of defendant's failure to communicate the material facts to plaintiff." *Miller v. Sloan, Listrom, Eisenbarth, Sloan and Glassman*, 267 Kan. 245, 260, 978 P.2d 922 (1999).

The district court granted summary judgment to all defendants after concluding McLellan failed to provide evidence of justifiable reliance, and also as to defendants Fate and the Raines for lack of proof of a duty to disclose.

## *Reasonable reliance*

"It is a familiar rule in Kansas courts that a plaintiff must show his or her reliance on the disputed communications and resulting detriment in order to establish fraud by omission or commission. [Citations omitted.]" *Nichols v. Kansas Political Action Committee*, 270 Kan. 37, 53, 11 P.3d 1134 (2000).

In support of their position that McLellan's fraud claim fails because she agreed not to rely on the defendants' representations and thus could not prove justifiable reliance, the defendants rely upon three cases: *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan.

App. 2d 546, 857 P.2d 1362 (1993); *Hamtil v. J.C. Nichols Real Estate*, 22 Kan. App. 2d 809, 923 P.2d 513 (1996), and *Alires v. McGehee*, 277 Kan. 398, 85 P.3d 1191 (2004).

In *Boegel*, the plaintiff buyer alleged the bank fraudulently concealed unfavorable information regarding irrigation wells on the farm he purchased. As part of the contract, Boegel signed an agreement that included the following provision:

" 'BUYER acknowledges purchasing hereunder based on BUYER'S inspection and not upon any express or implied warranty or representation made by SELLER or SELLER'S agents, it being specifically agreed that the Premises and all irrigation equipment thereon, including, but not necessarily limited to engines, pumps, gearheads and center pivot sprinklers being sold "as is where is." ' " 18 Kan. App. 2d at 548.

*Boegel* held

"the reasonableness of Boegel's reliance on the Bank to disclose information about the wells was a key issue in the present case. Again, the contract required that Boegel not rely on the Bank's express or implied representations; the contract required Boegel to purchase the property based upon his own inspection." 18 Kan. App. 2d at 552.

McLellan seeks to distinguish *Boegel*, arguing she never took an affirmative duty to inspect the property as Boegel had. Paragraph 3 of the buyer's acknowledgment reads, in part: "I agree to verify any of the above information, and any other important information provided by SELLER or BROKER . . . by an independent investigation of my own." This language is substantially similar to the provision in *Boegel* in that it clearly imposes a burden on McLellan to inspect the property on her own and not rely on the seller's or broker's information in purchasing the property.

Furthermore, McLellan ignores *Boegel's* discussion of bargained-for contractual duties.

"In the present case, the Bank bargained for limited liability, and Boegel contractually assumed a duty to inspect the property. Given the terms of the contract, to allow Boegel to proceed to trial on his claim of fraudulent concealment seems to nullify the limited liability for which the Bank bargained." 18 Kan. App. 2d at 554.

Similarly in this case, the defendants here bargained for limited liability as spelled out in the provisions of the buyer's acknowledg-

ment. McLellan's agreement not to rely on the defendants' representations was part of the bargain.

In *Hamtil*, the plaintiffs also purchased a home with a leaky basement. They sued the sellers and brokers, among others, for negligent misrepresentation. The Hamtils had signed a buyer's acknowledgment and agreement which provided:

" '1. I have carefully inspected the property. Subject to any inspections allowed under my contract with seller, (and repairs to be made as therein required), I agree to purchase the property in its present condition only, without warranties or guarantees of any kind by seller of any realtor concerning the condition or value of the property.

" '2. I agree to verify any of the above information that is important to me by an independent investigation of my own. I have been advised to have the property examined by professional inspectors.

" '3. I acknowledge that neither seller nor any realtor involved in this transaction is an expert at detecting or repairing physical defect in the property. I state that no important representations concerning the condition of the property are being relied upon by me except as disclosed above or as fully set forth as follows: ——.' "

The *Hamtil* court found summary judgment for the defendants was appropriate. 22 Kan. App. 2d at 813. Citing *Boegel*, the court found that because the Hamtils had failed to note which, if any, representations of the defendants they were relying on, "the Hamtils agreed in writing that they were not relying on any representations" of the defendants. 22 Kan. App. 2d at 814.

*Hamtil* also noted that the buyers had inspected the property themselves and any damage apparent the day after the sale should have been apparent before they entered into the contract; the buyers chose to rely on professional inspectors which was in itself an expression of not relying on any statement made by a sales agent; and the buyers had the advice of an attorney before signing the buyer's acknowledgment and agreement. 22 Kan. App. 2d at 813. Similarly in this case, McLellan had inspections performed by professional inspectors and chose to rely on them. As the district court stated, McLellan admitted she relied on the inspection in her deposition testimony.

In *Alires*, the Kansas Supreme Court dealt with the issue of a leaky basement, limited liability of sellers, and a buyer's agreement

not to rely on representations of a seller or broker in a disclosure statement. As in this case, the buyers alleged fraud by the sellers. The Alires signed nearly the same buyer's acknowledgment as appeared in *Hamtil*:

" '1. I acknowledge that I have read and received a signed copy of the Seller's Property Disclosure Statement from the Seller, the Seller's agent, or transaction broker.

" '2. I have carefully inspected the property. Subject to any inspections allowed under my contract with Seller, I agree to purchase the property in its present condition only, without warranties or guarantees of any kind by Seller or any real estate licensee concerning the condition or value of the property.

" '3. I agree to verify any of the above information that is important to me by an independent investigation of my own. I have been advised to have the property examined by professional inspectors.

" '4. I acknowledge that neither seller nor any real estate licensee involved in this transaction is an expert at detecting or repairing physical defects in the property. I state that no important representations concerning the condition of the property are being relied upon by me except as disclosed above or as fully set forth as follows: ____.' " 277 Kan. 406-07.

There are important factual distinctions between this case and *Alires*, primarily that the buyers did not have an inspection performed and had "agreed that if they failed to have inspections performed, they waived 'any claim, right or cause of action relating to or arising from any condition of the property that would have been apparent had inspections been performed.' " 277 Kan. at 410.

Also, the agreement not to rely in *Alires* contains the language "except as disclosed above," which the court noted would not include brokers and did not require a separate indication when the representation was in the disclosure statement: "There was no need for the Alires to write in the representation on which they were relying because Mrs. McGehee's representation that the basement had leaked only when broken pipes needed repairing was already listed." 277 Kan. at 404, 408. In this case, the agreement not to rely addressed these issues, stating: "I specifically represent that there are no important representations concerning the condition or value of the Property made by SELLER *or BROKER* on which I am relying *except as may be fully set forth in writing and signed by them.*" (Emphasis added.) The language does not limit the rep-

resentations to those of the seller in the disclosure statement, and requires that any representations to be relied on must be "fully" set forth in writing, indicating a distinction between those representations stated in the disclosure statement.

Additionally, the disclosure statements in *Alires* and this case (quoted below) contained essentially the same provision:

"This is a disclosure of SELLER's knowledge of the condition of the property as of the date signed by SELLER and is not a substitute for any inspections or warranties that BUYER may wish to obtain. It is not a warranty of any kind by SELLER or a warranty or representation by the BROKER(S) or their agents."

Compare 277 Kan. at 407.

Although in *Alires* the Supreme Court found the seller had made affirmative misrepresentations, it held the buyers were not justified in relying on them:

"Under the facts of this case, the buyer of real estate could not reasonably rely upon representations of the seller when the truth or falsity of the representation would have been revealed by an inspection of the subject property and the misrepresentations were made prior to or as part of the contract in which the buyer contracted for the right to inspect, agreed that the statements of the seller were not warranties and should not replace the right of inspection, declined inspection, and waived any claims arising from defects which would have been revealed by an inspection." 277 Kan. at 411-12.

In this case, McLellan did not sign a waiver of claims in the event she failed to have inspections performed and, in fact, had inspections performed. In fact, J&J's inspection report recommended fixing a crack in the foundation to prevent the chance of leaks. Moreover, as mentioned above, McLellan admitted to relying on the inspection in her deposition testimony.

McLellan seeks to distinguish her case from the facts in *Boegel*, *Hamtil*, and *Alires*, alleging the realtors inserted themselves into the inspection process to her detriment and citing *White v. J.D. Reece Co.*, 29 Kan. App. 2d 226, 26 P.3d 701 (2001). In that case, the court explained that the realtor, Keller,

"took an active role in determining what repairs were needed and what repairs would be made. As a result, Keller controlled the course of repairs that were to be made. The evidence further indicates that White relied on Keller's advice that all necessary repairs had been completed and that a reinspection of the property

was unnecessary. Keller's assurances that the repairs had been made induced White to complete the purchase of the property." 29 Kan. App. 2d at 231-32.

*White* held: "[W]hen a real estate broker's agent purposely injects himself or herself into the independent investigation of the property to the buyer's detriment, the real estate broker and its agent cannot rely on the seller's disclosure statement to shield themselves from liability." 29 Kan. App. 2d at 234.

McLellan argues RNR, through Fate, "inserted itself into the inspection process and, by making several false statements, caused McLellan to choose an inexperienced home inspector who, after relying on the admittedly false disclosure statement, was unable to find leakage."

In support of her argument, McLellan cites the following facts: (1) Fate told her if she did not have the property inspected within the 10-day inspection period according to the contract, she would lose her right to inspect the property; (2) Fate claimed she attempted to persuade the Raines, through Bockelman, to agree to an extension on the inspection period, but the Raines refused; (3) Bockelman denied speaking with Fate or the Raines about the timing of the inspection; (4) Fate claimed she always recommended a structural engineer for her clients' inspections, but that none were available during the 10-day inspection period; (5) Fate chose J&J Home Inspection because other inspectors were unavailable; (6) Fate claimed to have worked with J&J in the past, but J&J denies this; and (7) J&J was very inexperienced and went out of business shortly after closing.

These facts, if true, constitute Fate's attempt to have any available inspector perform the inspection within the 10-day time period and imply she misled McLellan regarding speaking to Bockelman and the Raines about extending the inspection period and regarding her previous experience with J&J. While manipulative, however, Fate's conduct does constitute the level of involvement in the actual inspection and repairs as seen in *White*. In fact, McLellan chose not to have the inspector's recommended repairs performed, one of which was a crack in the front of the house that presented a "chance of leaks." She does not argue Fate induced

her to forego this and other nonmaintenance repairs noted in the inspection report.

### Duty to disclose

The district court additionally found Fate and the Raines did not have a duty to disclose and, thus, McLellan had failed to prove another required element of fraud and summary judgment in their favor was proper.

The district court held: "The Raines did not have a contractual obligation under the disclosure agreement to disclose all prior instances of leakage or dampness as discussed *infra* Part I." Part I of the memorandum opinion dealt with McLellan's breach of contract claim against them and the court determined the disclosure statement and buyer's acknowledgment and agreement imposed "no obligations" on the Raines.

The court did not elaborate further on its conclusion that the buyer's acknowledgment could affect the Raines' duty to disclose under the disclosure agreement. We assume, having found that McLellan could not justifiably rely on the Raines' disclosure (or failure to disclose), she could not prevail on her claim of fraud by silence. However, we believe the uncontested facts, and a reasonable interpretation of the disclosure statement, are more than sufficient to support the court's conclusion.

First, as noted above, our Supreme Court in *Alires* found that even though the seller had made affirmative misrepresentations, the buyers were not justified in relying on them. 277 Kan. at 411-12.

Next, we must consider the sellers' obligations under the disclosure statement. The interpretation and legal effect of written instruments are matters of law over which this court has unlimited review. *Stone v. U.S.D. No. 222*, 278 Kan. 166, 178-79, 91 P.3d 1194 (2004) (citing *Kansas Gas & Electric Co. v. Will Investments, Inc.*, 261 Kan. 125, 128, 928 P.2d 73 [1996]). Paragraph #3 provides: "This is a disclosure of SELLER'S knowledge of the condition of the property *as of the date signed by the SELLER*." (Emphasis added.) Also, paragraph 8(c) does not refer to past leakage

or dampness, unlike paragraph 8(d), which inquires about past or present problems with driveways, etc.

Further, paragraph 8(a) and (b) dealing with settling, shifting, and cracking of foundation/basement walls were checked "yes." These answers, together with the contractor's report attached to the disclosure statement were notice to the plaintiffs that the basement might leak.

Finally, McLellan's home inspection report informed her of the presence of cracks that create a "CHANCE OF LEAKS." Rather than terminate the contract, McLellan indicated on the inspection report those areas that she was requiring the Raines to repair by placing a star on the report summary contained on the first two pages of the report next to the following items: (a) driveway— repair crack; (b) repair crack in front of house (in the foundation wall, to reduce chance of leaks); (c) electrical wiring; (d) install GFCI electrical receptacle; (e) fix cracked window pane; and (f) clean gutters and clean chimney. The Raines agreed to repair three of the items but not the driveway or the foundation wall. As a result, the Raines agreed to lower the purchase price by $4,500. Prior to closing, the Raines had the agreed-upon repairs completed and McLellan reviewed the repairs before closing on May 31, 2001.

For these reasons, we agree with the court's conclusion that McLellan could not prevail on her claim of fraud based on the Raines' duty to disclose.

As to Fate, the court agreed with her argument that her duty to disclose under the Brokerage Relationships in Real Estate Transactions Act (BRRETA) was not triggered because she had no actual knowledge of water leakage in the basement. The relevant provision, K.S.A. 58-30,107(a)(2)(B), reads in pertinent part: "(a) A buyer's or a tenant's agent shall be a statutory agent with the duty and obligation to: . . . (2) promote the interests of the client with the utmost good faith, loyalty and fidelity, including: . . . (B) disclosing to the client all adverse material facts actually known by the licensee."

McLellan asserts Fate learned of the leakage when John Ferrell told her of it during the inspection, and that Fate told her she was aware of the leakage. Fate denies this. The district court found

that, even if true, Fate's notice of the leakage did not constitute actual knowledge of that fact because "actual knowledge" requires that the fact be witnessed firsthand. McLellan argues there is enough factual dispute to preclude summary judgment in Fate and RNR's favor. While a strong argument, the fact remains that McLellan's fraud claim against Fate, Bockelman, and RNR fails because she agreed not to rely on their representations and thus could not prove a required element of the claim.

Additionally, as the court found, McLellan's suit against Fate is barred by BRRETA.

"[A]ccording to K.S.A. 58-30,107(b), if Fate advised her client to get 'expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee, *no cause of action for any person shall arise against the licensee pertaining to such material matters.*' "

This appears to be a proper interpretation of the statute. Fate was required to advise McLellan "to obtain expert advice as to material matters about which the licensee knows but the specifics of which are beyond the expertise of the licensee" under K.S.A. 58-30,107(a)(2)(C). Fate, did in fact, advise McLellan to get a professional inspection of the property, a matter about which she may have known but which was beyond her expertise. K.S.A. 58-30,107(b) clearly prohibits any cause of action by McLellan against Fate pertaining to the inspection.

### McLellan's claim under the Kansas Consumer Protection Act

Finally, McLellan argues the district court erroneously granted the Realtors summary judgment on her Kansas Consumer Protection Act (KCPA) claim against them.

The interpretation of a statute is a question of law, and the appellate court's review is unlimited. *State v. Engles,* 270 Kan. 530, 532-33, 17 P.3d 355 (2001).

As to Fate, the court reiterated its finding and concluded that BRRETA barred McLellan's KCPA suit against her because she told McLellan to have an inspection performed. As discussed above, this interpretation of K.S.A. 58-30,107(b) is correct.

Concerning Bockelman and RNR, the court found that McLellan was not an "aggrieved consumer" under the KCPA, K.S.A.

50-634(a): "As case law makes it clear that Plaintiff could not justifiably rely on the representations of the agents, she could not be aggrieved by their actions or any purported violations of the act." The court reasoned: "Though the act does not explicitly require the element of reliance, this language ['aggrieved by a violation of this act'] makes such a determination relevant."

The Kansas Supreme Court has quoted with approval the following interpretation of "aggrieved" for purposes of the KCPA:

" ' "A party is aggrieved whose legal right is invaded by an act complained of or whose pecuniary interest is directly affected by the order. The term refers to a substantial grievance, denial of some personal or property right, or the imposition upon a party of some burden or obligation. In this sense it does not refer to persons who may happen to entertain desires on the subject, but *only to those who have rights which may be enforced at law* and whose pecuniary interest may be affected. (2 Am. Jur. 941, Appeal and Error, Secs. 149-152; Black's Law Dictionary, 3rd ed.)" ' " (Emphasis added.) *Finstad v. Washburn University*, 252 Kan. 465, 472, 845 P.2d 685 (1993).

*Finstad* only determined, under the facts of that case, what an "aggrieved consumer" was *not*: "[O]ne who is neither aware of nor damaged by a violation of the Act." 252 Kan. at 473. The court upheld summary judgment against the plaintiffs, finding that a causal connection between the alleged violation and damage suffered is required to maintain an action under K.S.A. 50-634(b). 252 Kan. at 474-75.

Here, the parties agreed McLellan was aware of and, in fact, relied on the alleged violation in purchasing the house, and McLellan asserted that she suffered damages as a result. If, however, McLellan had no legal right to enforce at law because she waived her right to rely on the realtors' representations when she signed the buyer's acknowledgment, she cannot constitute an "aggrieved consumer" according to the definition used in *Finstad*. As the realtors argue, her agreement not to rely on their representations prevented a causal connection between the representations and her claimed damage.

The district court properly granted the realtors' motion for summary judgment on McLellan's KCPA claims against them.

Affirmed.