No. 97,847

JASON L. OSTERHAUS, *Appellant*, v. JEAN BETTY TOTH, *et al.*, and
JEFFREY S. SCHUNK & TOPPROS REAL ESTATE, INC., *Appellees*.

(249 P.3d 888)

Opinion filed March 11, 2011.

*James E. Kiley, Jr.*, of The Kiley Law Firm, LLC, of Overland Park, argued the cause and was on the briefs for appellant.

*Thomas S. Busch*, of Holman, Hansen and Colville, P.C., of Overland Park, argued the cause and was on the briefs for appellees Jean Betty Toth and Toth Trust.

*John W. Nitcher*, of Riling, Burkhead and Nitcher, Chtd., of Lawrence, argued the cause and was on the briefs for appellees Jeffrey S. Schunk and TopPros Real Estate, Inc.

*Robert S. Caldwell*, of Caldwell & Moll, L.C., of Overland Park, was on the brief for *amicus curiae* Reece & Nichols Realtors, Inc.

The opinion of the court was delivered by

NUSS, J.: This case arises out of the sale of a home which was later discovered to have structural flaws. Jason Osterhaus, a first-time home buyer, brought an action against the seller (Jean Betty Toth), Toth's real estate agent (Jeffrey Schunk), and Schunk's company (TopPros Real Estate, Inc.). Osterhaus alleged deceptive and unconscionable acts under the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*, fraud, fraud by silence, negligent misrepresentation, and breach of contract. The district court

granted summary judgment to defendants on all claims. The Court of Appeals majority reversed. Toth's and Schunk's separate petitions for review were granted by this court; our jurisdiction is under K.S.A. 20-3018(b).

The parties' issues on appeal, and our accompanying holdings, are as follows:

1.   Did the district court err in granting summary judgment for defendants based upon *McLellan v. Raines*, 36 Kan. App. 2d 1, 140 P.3d 1034 (2006), and Osterhaus' signature on the buyer acknowledgment and agreement? Yes.

2.   Did the "as is" and release provisions in the form amendment bar Osterhaus' claim for breach of contract? Remand for factual findings.

3.   Were Osterhaus' claims for fraud and negligent misrepresentation barred by the 2-year limitations period in K.S.A. 60-513(a)(3)? Remand for factual findings.

4.   Were Osterhaus' claims against Toth for violation of the KCPA barred because Toth was not a "supplier" under the provisions of the Act? Remand for factual findings.

5.   Did the district court err in granting summary judgment on the fraudulent misrepresentation claim under the Brokerage Relationships in Real Estate Transactions Act? Remand for factual findings.

6.   Did the district court err in failing to rule on Osterhaus' motion for leave to amend his petition? Remand for factual findings.

7.   Were Osterhaus' claims based on fraud barred because they are identical to those he made for breach of contract? Remand for factual findings.

8.   Did the Court of Appeals err in failing to sustain the district court's grant of summary judgment to TopPros because it did not exist until 20 months after the contract between Osterhaus and Toth closed? Abandoned.

9.   Did the Court of Appeals err in failing to dismiss the breach of contract claim against Schunk on the grounds that he was not a party to the contract? Abandoned.

Accordingly, we affirm the Court of Appeals panel and remand to the district court for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

Mark and Cathy Ross sold their Overland Park home to Jean Toth in the spring of 2001. Prior to the sale, the Rosses completed a "Seller's Disclosure" statement which indicated they had experienced cracks in the foundation, wall movement, and water in the basement. In March 2001, Mark showed the house to Toth. He discussed with her cracks in the basement walls, movement of the foundation walls, and repairs the Rosses made. Toth was "very concerned" about water leakage and said she would have the property inspected.

A few days later Toth had the home inspected. The inspection revealed hairline cracks in the foundation walls. But Toth proceeded with the purchase, and the sale closed in May 2001. After Toth's purchase, she called the Rosses on several occasions to ask questions about the property or to seek their assistance. In September 2001, after a heavy rain, Toth called the Rosses and complained of water in her basement. She told Mark that she had hired a foundation inspector who determined that the "sheetrock on the interior wall near the west foundation wall of the house had buckled because the west foundation had shifted inward." Toth showed Mark the buckled sheetrock wall and asked him how to fix the water problem. At Mark's suggestion, Toth purchased fill dirt which Mark placed around the foundation exterior.

Toth put the house on the market the following spring. That July, she signed an exclusive listing contract with "TopPros Real Estate—Broker Jeff Schunk." Schunk had Toth complete a form captioned "Seller's Disclosure-Statement of Condition" (disclosure statement). It stated in paragraph 2, under "Seller's Instructions":

> "*SELLER agrees to disclose to BUYER all material defects, conditions and facts known to SELLER which may materially affect the value of the property.* This disclosure statement is designed to assist SELLER in making these disclosures. The listing broker, the selling broker and their respective agents will rely on this information when they evaluate, market and present the Seller's property to prospective Buyers." (Emphasis added.)

Despite Toth's experience during the past year with the house's foundation walls, cracks and movement, and basement water, and her knowledge of the Rosses' similar experience before that, in paragraph 8 Toth answered "No" to the following questions regarding the "Structural, Basement and Crawl Space Items":

"Are you aware of:

"(a) Any *movement, shifting, deterioration, or other problems with walls, foundations*, crawl space or slab?

"(b) Any *cracks or flaws in the walls*, ceilings, *foundations*, concrete slab, crawl space, basement floor or garage?

"(c) Any *water leakage* or dampness *in the* house crawl space or *basement?*

. . . .

"(h) Any *repairs or other attempts to control* the cause or effect *of any problem described above?"* (Emphasis added.)

The disclosure statement then provided that "[i]f any of the answers in this section are 'Yes', explain in detail. When describing repairs or control efforts, describe the location, extent, date, and name of the person who did the repair or control effort and attach any inspection reports, estimates or receipts." Despite Mark's fill dirt control efforts, they were not described. Nor was a copy attached of a report of Toth's foundation inspector regarding the sheetrock buckling or movement of the foundation's west wall. A handwritten notation did provide, however, that "north garage wall moved 1", it has been repaired."

In response to paragraph 15 of the disclosure statement, captioned "Other Matters," Toth denied awareness of things such as fire damage and landfill/underground problems. She then answered "no" to the question asking, "Are you aware of *any other conditions* that may materially and adversely affect the value or desirability of the property?" (Emphasis added.)

Also on that disclosure statement, in response to paragraph 16 Toth represented that the house had an attic fan, a central vac and attachments, and a convection oven. None of these were, or ever had been, present in the home. At the end of the seller's section of the disclosure statement, Toth represented that her information was not only accurate and complete but also that she would notify

the listing agent if any information stated there changed prior to closing:

*"The undersigned Seller represents that the information set forth in the foregoing Disclosure Statement is accurate and complete.* Seller does not intend this Disclosure Statement to be a warranty or guarantee of any kind. Seller hereby authorizes their agent to provide this information to prospective Buyers of the property and to real estate brokers and salespeople. Seller will promptly notify listing agent, in writing, if any information set forth in this disclosure changes prior to closing." (Emphasis added.)

The document concluded by stating: "THIS DISCLOSURE STATEMENT IS AN INTEGRAL PART OF THE AGREEMENT BETWEEN SELLER AND BUYER. IF NOT UNDERSTOOD CONSULT AN ATTORNEY BEFORE SIGNING."

Toth then signed and dated it on July 12, 2002.

Toth's agent, Schunk, walked through the house but did not perform an in-depth inspection. He testified in his deposition that he did not go over the disclosure statement with Toth and did not ask her any questions regarding the truth of her representations.

David Tomlinson made an offer to buy Toth's house 6 days later on July 18, 2002. Shortly thereafter he had the property inspected. While the inspector and Tomlinson were in the basement, Tomlinson noticed a large crack in the back of a piece of sheetrock. He stated that they were able to see the back of the sheetrock in the adjoining room because they were in an unfinished room. The inspector explained to Tomlinson that the sheetrock crack was caused by movement of a foundation wall. Because of structural problems, Tomlinson canceled the contract 6 days after his offer to purchase. Two days later Schunk met with his seller, Toth, and she signed the cancellation release agreement.

After Schunk received the notice of the contract cancellation and a copy of Tomlinson's inspection report, he went to Toth's home to look at the basement's west wall. He then recommended that Toth contact Glenn Marsee & Son Foundation Repair, Inc. (Marsee) to repair the crack in the foundation. On July 31, 2002, Marsee put epoxy in "eighteen feet of cracks" in the west foundation wall.

Two days after Tomlinson canceled his contract and 5 days before Marsee's repairs, Osterhaus' real estate agent, Ronda Lenci,

expressed interest in Toth's house. Schunk testified in his deposition that he provided Lenci with a copy of Tomlinson's inspection report and explained that the contract had been terminated due to issues with the foundation, which were going to be repaired. Lenci testified in her deposition, however, that she did not recall Schunk ever telling her about Tomlinson's inspection report, Tomlinson's contract cancellation, or the foundation problems in the basement.

Osterhaus made an offer to purchase and on July 26, 2002, shortly before Marsee's epoxy repairs, he signed the "Buyer Acknowledgment and Agreement" section of Toth's seller's disclosure statement. That buyer's acknowledgment appears at the bottom of page 3 and states in its entirety:

"1. I understand and agree that the information in this form is limited to information of which SELLER has actual knowledge and that SELLER need only make an earnest effort *at fully revealing* the information requested.

"2. This property is being sold to me without warranties or guaranties of any kind by SELLER or BROKER(S) or agents concerning the condition or value of the Property.

"3. I agree to verify any of the above information, and any other important information provided by SELLER or BROKER (including any information obtained through the multiple listing service) by an independent investigation of my own. I have been specifically advised to have the property examined by professional inspectors.

"4. I acknowledge that neither SELLER nor BROKER is an expert at detecting or repairing physical defects in the property." (Emphasis added.)

Of most importance to the analysis of the instant case is paragraph 5, which states:

"5. I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them."

Toth counteroffered on July 27. She also corrected her earlier representation to now indicate that there was no attic fan, central vac and attachments, or convection oven on the property. However, again, despite Toth's experience with the house the past year, and her knowledge of the Rosses' experience before that, she did not amend her disclosure statement to inform Osterhaus that she

had experienced cracks in the basement, movement in a foundation wall, and water in her basement.

Osterhaus hired an inspector, Brian Rawlings, and attended part of the inspection. Osterhaus testified in his deposition that Rawlings was in the house for approximately 3 or 4 hours. He also testified that on his previous tours of the home, he did not notice any cracks in the basement walls because shelves and appliances were in front of the cracked sheetrock. However, at the time of the inspection on August 3, 2002, while Osterhaus did not see any open cracks, he did notice "a continuous line of epoxy filling covering what appeared to be a prior crack in the west wall." Rawlings' inspection report reflects these observations, noting: "Basement is partially finished, viewing was restricted by wall, ceiling and floor coverings in area, Basement is only partially accessible due to storage in areas." And the comment section in Rawlings' report concerning the basement walls provides: "Poured concrete, Major cracking is noted. Repairs have been made. Appears serviceable." Osterhaus received this inspection report before proceeding to close on the property.

After negotiations which included both an Addendum and Counteroffer Addendum, on August 10 and 14, 2002, Osterhaus and Toth signed a final Amendment (Resolution of Unacceptable Conditions) to the contract. Per these documents, Toth agreed to pay $900 in closing costs in lieu of correcting the listed unacceptable conditions: fix the specified wiring issue, have the chimney professionally cleaned, and blow additional fiberglass or cellulose insulation to the specified rating. In August 2002, Osterhaus took possession.

In spring 2004, Osterhaus noticed some water seeping into the carpet in a finished portion of the basement. He eventually discovered that water was coming down the foundation wall behind the sheetrock. By that summer, he experienced water leakage when it rained, which resulted in "substantial amounts of mold" behind the walls. Osterhaus estimated that it would cost more than $80,000 to fully repair his home.

Later that summer, Osterhaus sued Toth, Schunk, and TopPros. Count I alleged deceptive and unconscionable acts in violation of

the KCPA. Count II alleged fraud, *i.e.*, intentional misrepresentation, claiming that Toth and Schunk intended to defraud Osterhaus by concealing the water problems in the basement. Count III alleged fraud by silence, claiming Toth and Schunk knew or should have known there was wall movement, problems with the foundation walls, and water problems in the basement. Count IV claimed negligent misrepresentation against Schunk and his agency, TopPros, which was separate from the intentional misrepresentation claim (Count II), because they "failed to exercise reasonable care or competence to obtain or communicate true information" as required by the Brokerage Relationships in Real Estate Transactions Act (BRRETA), K.S.A. 58-30,101 *et seq.* Finally, Count V alleged breach of contract, claiming that Toth, Schunk, and TopPros all failed "to provide truthful, accurate, and complete information to Osterhaus in Toth's Seller's Disclosure."

All three defendants filed summary judgment motions and argued Osterhaus' claims were resolved by *McLellan v. Raines*, 36 Kan. App. 2d 1, 140 P.3d 1034 (2006). *McLellan* essentially held that by signing and agreeing to the buyers' section of the seller's disclosure statement, the buyer waives the right to rely upon the seller's representations in the disclosure statement and the accompanying right to later complain of house defects.

After hearing arguments, the district court concluded that *McLellan* controlled and granted summary judgment to defendants on all claims. The district court also noted that Osterhaus had an independent inspection performed, which revealed "major cracking" in the basement wall. Osterhaus appealed, maintaining that *McLellan* should be overturned because it destroyed the intended purpose of the seller's disclosure statement.

A panel of the Court of Appeals reversed and remanded in *Osterhaus v. Toth*, 39 Kan. App. 2d 999, 187 P.3d 126 (2008). The panel departed from the holding and rationale of *McLellan* and two very similar cases that followed: *Katzenmeier v. Oppenlander*, 39 Kan. App. 2d 259, 178 P.3d 66 (2008), and *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 154 P.3d 1094, *rev. denied*, 284 Kan. 945 (2007). Judge Leben dissented in part from the majority opinion, explaining that while he believed *McLellan, Katzenmeier,* and

*Brennan* were all wrongly decided, he would reserve changing the law for this court. 39 Kan. App. 2d at 1015-16 (Leben, J., dissenting in part).

More facts will be added as necessary to the analysis.

## ANALYSIS

### *Standard of Review*

This court's standard for reviewing a district court's grant of summary judgment is well-known:

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought.* When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and *where we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.*' " ' " (Emphasis added.) *Warner v. Stover*, 283 Kan. 453, 455-56, 153 P.3d 1245 (2007).

Additionally, for this court to determine whether the district court erred, it must interpret the sales contract. The legal effect of a written instrument is a question of law. It may be construed and its legal effect determined by the appellate court regardless of the construction made by the district court. *Foundation Property Investments v. CTP*, 286 Kan. 597, Syl. ¶ 2, 186 P.3d 766 (2008). The primary rule for interpreting written contracts is to ascertain the parties' intent. If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction. *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007); see *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, Syl. ¶ 6, 225 P.3d 707 (2010).

Issue 1: *The district court erred in granting summary judgment for defendants based upon* McLellan v. Raines, *and Osterhaus' signature on the buyer's acknowledgment and agreement.*

In granting defendants' motions for summary judgment, the district court ruled that under *McLellan*, Osterhaus' signing and agreeing to the buyer's acknowledgment effectively waived his right to rely upon Toth's representations in the seller's disclosure statement:

"As set out above, [paragraph 5 of] the buyer's acknowledgment states: 'I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them.' Osterhaus did not list representations upon which he was relying. In signing and agreeing to this particular clause, Osterhaus waived his right to rely upon Toth's representations in the disclosure statement. See *McClellan v. Raines*, 140 P.3d at 1038 ('The unambiguous language of paragraph 5 clearly directs McLellan to either indicate which representations she was relying on or agree to rely on none of them. She did not so indicate and thus waived her right to rely on . . . the disclosure statement.')."

Without citation, the district court also held that "Osterhaus released Toth from any obligation *to disclose adverse information* on the disclosure statement." (Emphasis added.)

The court basically reasoned that due to Osterhaus' waiver of his right to rely upon any representations, then obviously he could not prove reliance. Reliance was an essential element of each of Osterhaus' claims—fraud, fraud by silence, negligent misrepresentation, violation of the KCPA, and breach of contract (because Osterhaus allegedly agreed not to rely upon the representations, "Toth's false statements did not constitute a breach of the contract"). Consequently, summary judgment was granted. See *U.S.D. No. 232 v. CWD Investments*, 288 Kan. 536, 555, 205 P.3d 1245 (2009) (a defendant is entitled to summary judgment if the defendant can establish the absence of evidence necessary to support an essential element of the plaintiff's case); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23,106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Osterhaus now argues that *McLellan* was wrongly decided as a matter of law, and therefore the subsequent Court of Appeals opinions that paid homage to it were also wrong. Accordingly, the buyers did not waive their right to rely upon seller representations about their houses. Toth, Schunk, and TopPros respond that

*McLennan* was correctly decided. Before we can address the Court of Appeals analysis in *McLellan*, however, we must review an earlier decision from this court.

*Alires v. McGehee*

In *Alires v. McGehee*, 277 Kan. 398, 85 P.3d 1191 (2004), the Alireses purchased a home from the McGehees. After the basement leaked, they successfully sued for fraudulent misrepresentation. The Alireses claimed the McGehees had fraudulently misrepresented the condition of the house when they orally represented that the basement did not leak. On the seller's disclosure statement, Mrs. McGehee answered "Yes," to the question, "Has there ever been leaking or seepage in the basement or crawl space?" But she wrote in the explanatory space, "Repaired broken pipe." 277 Kan. at 399-400. At trial, Mrs. McGehee testified about two other instances of basement water leakage which she had not disclosed in the statement, attributing the failure to faulty memory due to recent brain tumor surgery.

The top of the *Alires* seller's property disclosure form read: " 'THIS STATEMENT . . . IS NOT A WARRANTY OF ANY KIND BY THE SELLER(S) OR ANY REAL ESTATE LICENSEE IN THIS TRANSACTION, AND SHOULD NOT BE ACCEPTED AS A SUBSTITUTE FOR ANY *INSPECTIONS* OR WARRANTIES THE BUYER MAY WISH TO OBTAIN.' " (Emphasis added.) 277 Kan. at 407. Similarly, Toth's disclosure statement provides at paragraph 3: "This is . . . not a substitute for any inspections or warranties that BUYER may wish to obtain. It is not a warranty of any kind by SELLER or a warranty or representation by the BROKER(S) or their agents." Likewise, Osterhaus' acknowledgment states in paragraph 2: "This property is being sold to me without warranties or guarantees of any kind by SELLER or BROKER(S) or agents concerning the condition or value of the Property."

Paragraph 3 in the *Alires* buyer's acknowledgment stated: " 'I [buyer] agree to verify any of the above information that is important to me by an independent investigation of my own. I have been advised to have the property examined by professional inspectors.' "

277 Kan. at 407. Similarly, Osterhaus acknowledged in paragraph 3 that "I agree to verify any of the above information, and any other important information provided by SELLER or BROKER (including any information obtained through the multiple listing service) by an independent investigation of my own. I have been specifically advised to have the property examined by professional inspectors."

Another *Alires* paragraph further advised about the use of buyer inspections. It contained an express buyer waiver of all claims arising from any property condition that would have been apparent from inspections had they been performed. It read in relevant part:

" 'Buyer and Seller agree that the real estate licensees involved in this transaction are not experts regarding whether any environmental or health hazards, defects in the mechanical equipment or systems, *structural defects,* or damage from wood destroying insects exists in and on the property. Buyer and seller should seek expert advice and *obtain inspections* to determine if hazards, *defects or damage* exist in and on the property. *If inspections are not performed regarding all or part of the property, Buyer is bound by whatever information an inspection would have revealed, and waives any claim, right or cause of action relating to or arising from any condition of the property that would have been apparent had inspections been performed.* Unless otherwise provided in paragraphs relating to specific inspections, Buyer accepts the property in its current condition. This shall not be deemed a waiver or modification of any implied warranties which may exist.' " (Emphasis added.) 277 Kan. at 407.

In a contract addendum, the Alireses expressly agreed to waive their contractual right of inspection, which in turn waived their right to complain of property defects that would have been apparent during such inspections. While Mr. Alires testified at trial that he did not have the foundation inspected because he trusted Mrs. McGehee's representation that the basement did not leak, he agreed that if an inspection had been done, a determination about the condition of the basement could have been made before closing. 277 Kan. at 401.

We initially examined the seller's argument—adopted by the *Alires* Court of Appeals—that the Alireses were not justified as buyers in relying on the alleged misrepresentations because the seller's disclosure statement contained a paragraph specifically allowing the Alireses to note any important representations being relied

upon, and they wrote nothing there. That section of the buyer's acknowledgment provided:

" '4.   I acknowledge that neither Seller nor any real estate licensee involved in this transaction is an expert at detecting or repairing physical defects in the property. I state that no important representations concerning the condition of the property are being relied upon by me *except as disclosed above or as fully set forth as follows:* ____.' " (Emphasis added.) 277 Kan. at 406-07.

After noting that justifiable reliance is an element of fraud, we rejected the sellers' argument that buyers' reliance was barred purely because of the language of the acknowledgment. We observed that the sellers' disclosure statement was integrated into the contract. We also observed that one of the alleged misrepresentations, *i.e.*, that the basement had leaked only when broken pipes needed repairing, was "disclosed above" in the disclosure form. Because the write-in section was for representations not mentioned in the "above" section of the contract, we concluded: "There was no need for the Alireses to write in the representation on which they were relying because Mrs. McGehee's representation that the basement had leaked only when broken pipes needed repairing was already listed." 277 Kan. at 404.

Having disposed of this contractual interpretation argument of sellers the McGehees, we then turned to whether the Alireses were actually justified in their reliance upon the McGehees' statements. More specifically, we examined whether the Alireses' agreement to buy the house "as is" and their written waiver of their contractual right of inspection (which, per the contract, also would waive their right to claim property defects apparent during such inspections) abrogated their claim of fraud. After first noting that whether fraud exists is a question of fact, we affirmed the trial court's findings that Mrs. McGehee indeed made untrue statements of fact and knew they were untrue. 277 Kan. at 403-06.

We next examined the specific contract paragraphs concerning inspections and waivers. The McGehees argued the contractual limitations on their liability should be applied to bar the Alireses' cause of action for fraudulent misrepresentation. The Alireses responded that the court should ignore the contract's attempted lim-

itations on the McGehees' liability because the contract had been fraudulently induced.

We first discussed at length the McGehees' cited cases: *Hamtil v. J.C. Nichols Real Estate*, 22 Kan. App. 2d 809, 923 P.2d 513 (1996), and *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan. App. 2d 546, 857 P.2d 1362, *rev. denied* 253 Kan. 856 (1993). *Hamtil* involved a buyer's written acknowledgment that was virtually identical to the one in *Alires*. We distinguished *Hamtil* for several reasons, however, holding it was of little support to the McGehees. Among other things, we noted the *Hamtil* claims were against the realtors, not the sellers. But more critically, we also observed that the buyers in *Hamtil* simply alleged negligence and negligent misrepresentation, while the buyers in *Alires* alleged fraud. The *Hamtil* court had held that contracts not illegal or contrary to public policy will be upheld *absent fraud*, mistake, or duress. *Alires*, 277 Kan. at 409.

*Boegel*, however, was of support to the McGehees. There, the plaintiff buyer argued that the defendant seller failed to disclose its knowledge about poorly performing irrigation wells on the farm it sold to plaintiff. More particularly, the buyer contended the seller knew that the buyer was mistaken and relying upon the seller's representations. After the buyer appealed the jury verdict denying his claim for fraudulent concealment, the Court of Appeals affirmed. It held that because of a written waiver provision stating that the buyer was relying upon his own inspection and not upon any express or implied warranty or representation made by the seller, and that the farm was being sold "as is where is," the contract prevented the buyer from relying on the seller's representations. In short, the buyer contractually assumed a duty to inspect the property, and he did not do so. 277 Kan. at 409-10 (citing *Boegel*, 18 Kan. App. 2d at 552). The *Boegel* panel held the seller had bargained for limited liability, noting the buyer's "claim of fraudulent concealment seems to nullify the limited liability for which the Bank bargained." 227 Kan. at 410 (citing *Boegel*, 18 Kan. App. 2d at 554).

Like the holding in *Boegel*, we held in *Alires* that the Alireses contractually assumed the duty to inspect (" 'I agree to verify any

of the above information that is important to me by an independent investigation of my own.' " 277 Kan. at 407.) and then failed to conduct an inspection. In addition to *Boegel*'s similar holdings, we also held the Alireses contractually agreed that if they failed to have inspections performed, they waived " 'any claim, right or cause of action relating to or arising from any condition of the property that would have been apparent had inspections been performed.' " 277 Kan. at 410. As a result, in order to prove their case, the Alireses needed to provide evidence that, even if an inspection had been performed, the defects in the foundation would not have been apparent. This they failed to do. We also observed that *Boegel* included not only a fraudulent concealment claim but also, like the Alireses' contention, an affirmative misrepresentation.

Nevertheless, in an argument related to the one analyzed immediately above, the Alireses finally argued that the contractual term providing for waiver of defect claims because of their failure to inspect should not be enforced because it was induced by Mrs. McGehee's fraudulent misrepresentations. This argument required our determination of the reasonableness of the Alireses' reliance on those misrepresentations, as justifiable reliance is an element of fraud. This led us to look at two cases: *Munkres v. McCaskill*, 64 Kan. 516, 68 P. 42 (1902), and *Fox v. Wilson*, 211 Kan. 563, Syl. ¶ 9, 507 P.2d 252 (1973).

We first examined the "similar factual situation" in *Munkres*. *Alires*, 277 Kan. at 411. There, the parties entered into an agreement to exchange land subject to a stipulation that "the contract should not be binding until each party had investigated the property of the other and each assumed the responsibility to make a full, fair, and complete examination of the property to be satisfied as to the truth or falsity of the representations made by the other." 277 Kan. at 411 (citing *Munkres*, 64 Kan. 516, Syl. ¶ 1). We held that once a party made the examination, signified satisfaction, and closed the property trade by exchanging title papers, that party could not rescind the contract on the ground that it was induced to make the contract in reliance on the false representations by the other unless the other party fraudulently prevented the making of

a full, fair, and complete examination of the property. *Munkres*, 64 Kan. 516, Syl. ¶ 1.

By contrast, when we examined *Fox*, we found no such agreement to investigate. We had concluded in *Fox* that where a contract is induced by a false representation of fact, it is not a defense that the buyer could have discovered the falsity of the representation if due diligence had been exercised. *Alires*, 277 Kan. at 411 (citing *Fox*, 211 Kan. 563, Syl. ¶ 9). However, we held the critical difference between the two cases' outcomes was the agreement in *Munkres* to undertake an investigation: "the fact there was an undertaking to investigate relates to both the issues of whether the representation was material *and of whether the recipient of the information reasonably relied upon the representation.* See Restatement (Second) of Contract § 167, comment b; Restatement (Second) of Contract § 172, comment b." (Emphasis added.) *Alires*, 277 Kan. at 411.

In *Alires*, we concluded our opinion by expressing our rationale and holding against the buyer Alireses as follows:

> "*Under the facts of this case,* the buyer of real estate could not reasonably rely upon representations of the seller when the truth or falsity of the representation would have been revealed by an inspection of the subject property and the misrepresentations were made prior to or as part of the contract in which the buyer contracted for the right to inspect, agreed that the statements of the seller were not warranties and should not replace the right of inspection, declined inspection, and waived any claims arising from defects which would have been revealed by an inspection. There is no showing in the record that the subsequent contract addendum which contained the waiver of the right to inspect was induced by any additional misrepresentations of the seller. Thus, . . . the Alireses were not justified in their reliance upon the misrepresentations of Mrs. McGehee." (Emphasis added.) 277 Kan. at 411-12.

In short, as a matter of law, a buyer may not reasonably rely on the admittedly false representations of the seller when (1) the truth or falsity of a representation would be revealed by an inspection *and* (2)(a) the misrepresentations were made prior to or as part of a contract (b) in which the buyer contracted for the right to inspect the property, (c) the buyer agreed that statements of the seller were not warranties and did not replace the right of inspection, (d) the buyer declined to inspect the property, and (e) the buyer contrac-

tually waived any claims arising from the defects which would have been revealed in the inspection.

But a contractual waiver does not necessarily bar claims such as fraudulent misrepresentation and breach of contract as a matter of law where a buyer's reasonable inspection prior to purchase did not reveal a seller's false representation and later defects are discovered.

*McLellan v. Raines*

Two years after *Alires*, the Court of Appeals issued its opinion *McLellan v. Raines*, 36 Kan. App. 2d 1, 140 P.3d 1034 (2006), which the district court in the present case held concerned "uniquely similar facts." The *McLellan* sellers represented in a disclosure statement that they were not aware of water leakage or dampness in the basement, a representation the buyer, McLellan, alleged was "admittedly false." 36 Kan. App. 2d at 14. McLellan relied upon the disclosure statement. She then had an inspection done which found no evidence of damage to the unfinished basement or foundation walls and no evidence of water entry or water damage to the property.

Shortly after moving in, McLellan experienced water leakage in the basement. She brought an action against the sellers, claiming breach of contract, negligent misrepresentation, fraud by omission, and claims under the KCPA. The *McLellan* panel reviewed the contract's Buyer Acknowledgment and Agreement, paragraph 5, which is identical to the one acknowledged by Osterhaus:

"I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them." 36 Kan. App. 2d at 4.

The panel upheld the district court's grant of summary judgment to the sellers on all of buyer's claims. Its rejection of all of buyer's theories was primarily based upon its reading of paragraph 5, which it interpreted as requiring a writing—separate from the sellers' disclosure statement—that set forth the sellers' representations upon which McLellan relied. It declared: "The unambiguous language of paragraph 5 clearly directs McLellan to either indicate

which representations she is relying on or agree to rely on none of them. She did not so indicate and thus waived her right to rely on the Raines' representations *in the disclosure statement.*" (Emphasis added.) 36 Kan. App. 2d at 8.

We disagree with the panel's holding requiring a separate document containing the sellers' representations relied upon by the buyer because a "writing . . . signed by them" in paragraph 5 does not specify a separate writing by the parties. Rather, it simply indicates that the one who made the representation must have signed the writing. As Judge Leben pointed out when discussing the same form language in his concurring opinion in *Katzenmeier v. Oppenlander,* 39 Kan. App. 2d 259, 270, 178 P.3d 66 (2008):

"[T]he seller has already satisfied both parts of the phrase actually used because the seller has [1] set forth in writing and [2] signed the disclosures, all contained in the very same document. To suggest that yet another document was needed for the buyer to be able to rely upon what the seller has already put in writing and signed renders the disclosure statement without any legal effect."

*Cf. Johnson County Bank v. Ross,* 28 Kan. App. 2d 8, 10-11, 13 P.3d 351 (2000) (The law favors reasonable interpretations of contracts, and results which vitiate the purpose of the terms of the agreement to an absurdity should be avoided.).

The *McLellan* panel's interpretation of paragraph 5 drove its analysis of each of McLellan's claims. For example, the panel concluded that McLellan could not prove a breach of contract because she waived her right to rely on any representation by failing to set them out in a writing separate from the disclosure statement. It additionally concluded that McLellan's waiver also covered information the sellers had not even placed in the disclosure statement:

"Because McLellan released the Raines from *any obligation to disclose adverse information on the disclosure statement* and agreed not to rely on their statements therein, any false statement did not constitute a breach of contract." (Emphasis added.) 36 Kan. App. 2d at 8.

Because the panel concluded there had been no breach of contract, it reasoned that any damages McLellan suffered could not have been the proximate result of contract breach.

The *McLellan* panel's interpretation of paragraph 5 of the buyer's acknowledgement not only "renders the disclosure statement without any legal effect," but it is also at odds with key provisions in that statement. For example, paragraph 2 provides: "SELLER agrees to disclose to BUYER all material defects, conditions and facts known to SELLER which may materially affect the value of the property. This disclosure statement is designed to assist SELLER in making these disclosures." Moreover, paragraph 15(b) asks the seller, "Are you aware of any other conditions that may materially and adversely affect the value or desirability of the property?" Additionally, the unnumbered paragraph immediately above the seller's signature line states: "The undersigned Seller represents that the information set forth in the foregoing Disclosure Statement *is accurate and complete*. . . . Seller hereby authorizes their agent to provide this information to prospective Buyers of the property . . . . Seller will promptly notify listing agent, in writing, if any information set forth in this disclosure changes prior to closing." (Emphasis added.)

In turn, the buyer acknowledges in paragraph 1 of the Acknowledgment: "I understand and agree that the information in this form is limited to information of which SELLER has actual knowledge and that SELLER need only make an earnest effort at *fully revealing the information requested*." (Emphasis added.) And, as mentioned, the disclosure statement expressly states that it "IS AN INTEGRAL PART OF THE AGREEMENT BETWEEN SELLER AND BUYER." A cardinal rule of contract construction requires the court to construe all these provisions together and in harmony rather than in isolation. *Decatur County Feed Yard, Inc. v. Fahey*, 266 Kan. 999, 1005, 974 P.2d 569 (1999).

The *McLellan* panel's interpretation of paragraph 5 of the buyer's acknowledgment as requiring a separate writing setting forth the seller's representations upon which buyer relied also appears inconsistent with several provisions of the Residential Sales Contract between seller and buyer. For example, its paragraph 5, Condition of Property, provides in relevant part: "THIS CONTRACT SHALL NOT BE EFFECTIVE UNTIL SELLER COMPLETES AND BUYER SIGNS A SELLER'S DISCLOSURE-

STATEMENT OF CONDITION FOR THE PROPERTY." On a similar note, Paragraph 6 expressly states, "The following Addenda . . . are attached hereto and are a part of this Contract: . . . seller's disclosure."

Under the *McClellan* panel's interpretation, in the absence of a separate writing the buyer's signed acknowledgment essentially metamorphoses into a terminator of any seller obligation to provide the complete truth about the property. In other words, the seller can both intentionally make misrepresentations in the information it actually discloses and can intentionally fail to disclose adverse information altogether in the document ironically captioned "Seller's Disclosure-Statement of Condition." For all of these reasons, we hold this interpretation to be erroneous. Accordingly, we hold that paragraph 5 of the buyer's acknowledgment does not relieve a seller of the obligation to make accurate and complete disclosures and does not bar Osterhaus' contract claims as a matter of law.

As for the panel's incorrect interpretation also driving its analysis of McLellan's other claims, the panel ultimately concluded that "McLellan's fraud claim against Fate [McLellan's agent], Bockel-man [sellers' agent] and RNR [realtor of both agents] fails because she agreed not to rely on their representations and thus could not prove a required element of the claim." 36 Kan. App. 2d at 17. The panel also concluded that no violation of the Kansas Consumer Protection Act (KCPA) could occur as McLellan "had no legal right to enforce at law because she waived her right to rely on the real-tors' representations when she signed the buyers' acknowledg-ment." 36 Kan. App. 2d at 18. Because McLellan had no legal right to enforce, she could not constitute an "aggrieved consumer" un-der the Act. 36 Kan. App. 2d at 18. The panel concluded that her agreement not to rely upon the realtors' representations prevented a causal connection between the representations and her claimed damage. 36 Kan. App. 2d at 18. The panel appeared to similarly dispose of the negligent misrepresentation claim. 36 Kan. App. 2d 1, Syl. ¶ 7 ("the district court was correct in granting summary judgment to buyer's agent and the sellers for lack of proof of a duty

to disclose"). Consequently, we also hold that paragraph 5 does not bar Osterhaus' reliance-based claims as a matter of law.

As noted by the district court here, the *McLellan* panel also held that the failure to indicate what representations buyer was relying upon in a separate writing resulted in a "waiver" of buyer's right to rely upon seller's representations in the disclosure statement. Because we have held both courts erred in requiring a separate writing, we need not determine whether the lack of a separate writing necessarily created a waiver. Compare *Alires*, 277 Kan. at 410 (waiver expressly stated in contract) with *McLellan*, 36 Kan. App. 2d at 13 (no express waiver language in contract).

In conclusion, rather than a terminator of a seller's obligation to provide complete truth about its property in the disclosure statement, we believe Paragraph 5 more likely attempts to serve as an integrator. An integration clause protects both the seller and the broker from the buyer's argument that the seller made oral representations upon which the buyer relied. *Cf. ARY Jewelers v. Krigel*, 277 Kan. 464, 476-77, 85 P.3d 1151 (2004) (integration clause provides that the written contract constitutes the entire agreement between the parties).

*Court of Appeals decisions following* McLellan

Two panels of the Court of Appeals adopted the reasoning of the *McLellan* court. In *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 154 P.3d 1094, *rev. denied* 284 Kan. 945 (2007), the buyers began experiencing water leakage problems and sued the sellers. Relying upon *McLellan*, the *Brennan* panel held as a matter of law that the language of the real estate form documents (identical to the ones in this case) required an identification of the sellers' representations upon which the buyers relied. Absent specific identification, the buyers could not show reliance upon the sellers' representations in the disclosure statement and those made before it was signed. Accordingly, they could not prevail on claims of fraudulent and negligent misrepresentation. 37 Kan. App. 2d at 387-88.

Perhaps because a fraud by silence claim does not concern actual representations, unlike the torts of fraudulent and negligent misrepresentation, the *Brennan* panel applied a different rationale

there. More specifically, it did not review the contract language but examined whether the sellers' failure to disclose material facts that were related to the house, *e.g.*, water leaks, were discoverable with a reasonable buyers' inspection. It held that the question of the reasonableness of the buyers' inspection, which had not discovered the defects causing leaks, was a question of fact that precluded summary judgment. The panel noted that the buyers produced evidence that they had not been provided with enough information to warrant further inspection of the water leak issue.

Most recently, in *Katzenmeier*, 39 Kan. App. 2d 259, the house buyers sued the seller after experiencing water leakage problems. Citing *McLellan*, the panel held as a matter of law that the language of the real estate form documents, also identical to the ones in the instant case, required an identification of the seller's representations upon which the buyers relied. Absent any specific identification, the buyers could not show reliance on the seller's representations in the disclosure statement and those made before it was signed. Consequently, the buyers could not prevail on claims of fraudulent and negligent misrepresentation. "[B]ecause the Katzenmeiers did not declare which representations they were relying on, it would seem that they had agreed not to rely on any of them." 39 Kan. App. 2d at 263.

As an apparent alternative ground for holding for the seller, the *Katzenmeier* panel also held that the buyers factually could not show their justifiable reliance—a required element of both intentional and negligent misrepresentation—upon the disclosure statement:

"They hired two professional inspectors to check the property. The inspections turned up evidence of water leakage and possible drainage problems. Although the inspections did not reveal the full extent of the previous water leaks, the inspections put the Katzenmeiers on notice of water leaks or drainage problems. This case, however, is unlike *Brennan* where it was alleged that careful inspections had not revealed the defect." 39 Kan. App. 2d at 264-65.

Given our rejection today of the *McLellan* rationale based upon paragraph 5 of the buyer's acknowledgment, those parts of *Brennan* and *Katzenmeier* relying upon *McLellan*'s rationale are likewise rejected. Similarly, the reliance by the district court upon

*McLellan* in our case, while certainly understandable, was nevertheless error. Accordingly, the appellate arguments of Toth, Schunk, TopPros, and the *amicus curiae* Reece & Nichols Realtors that embrace *McLellan* are rejected.

As a result, we reverse the district court's grant of summary judgment to defendants on all of Osterhaus' claims which were based upon the rationale that the reliance element could not be met as a matter of law due to his signature on, and agreement to, paragraph 5 of the buyer's acknowledgment.

While the defendant's contract-based argument of "no reliance" is rejected as a matter of law, another related issue must be addressed. Specifically, we must determine whether Toth's misrepresentations (fraudulent and negligent), or her failure to disclose defects, could have been reasonably relied upon by Osterhaus—or whether a reasonable inspection nevertheless would have revealed the defects about which he complains.

We begin by observing that Osterhaus complains many items were not disclosed by Toth, Schunk, or both. Examples include: concrete damage, *e.g.*, cracks to the foundation; the recency of the Marsee repairs; damage to the interior (sheetrock) basement wall; the movement of the west basement wall; water in the basement; and the Tomlinson inspection report or cancellation notice.

Osterhaus also complains not only of the defendants' failure to disclose but also of concealment of defects. According to Osterhaus, between Tomlinson's inspection and the viewing by Osterhaus and his inspector, Rawlings, Toth allegedly removed the damaged sheetrock on the south side of the wall and sealed up evidence of damage on the wall's north side by sheetrocking over it. He also complains that Toth repaired the *interior* partition wall so evidence of the wall movement would not be detected. Osterhaus further complains that Toth moved her personal property back to cover the west wall within 3 days of Marsee's repairs to prevent Rawlings from doing a reasonable and adequate investigation and inspection.

Osterhaus concludes most, if not all, of these matters could not have been discovered through reasonable inspection. See *Brennan,* 37 Kan. App. 2d at 379 (fraudulent nondisclosure, or fraud by silence, depends in large part on the buyer's inability to discover a

defect with a reasonable inspection). *Cf. Alires,* 277 Kan. at 411 (buyer could not reasonably rely upon representations of seller when truth or falsity of representation would have been revealed by an inspection of the property, unless fraud "prevented the making of a full, fair, and complete examination of the property").

Toth responds that Osterhaus noticed the ceiling-to-floor diagonal crack (and epoxy) in the west basement wall on the day of inspection, August 3, 2002, and therefore testified he was aware Toth had incorrectly filled out Section 8 of the disclosure statement regarding cracks and leakage in the basement foundation walls. Toth also argues that the comments by Osterhaus' inspector, Rawlings—"Major cracking is noted. Repairs have been made. Appears serviceable"—put Osterhaus on sufficient notice of recent cracking and movement of the west wall. Consequently, she contends his claims are barred. Toth further argues that when Rawlings saw the cracks in the basement wall (though epoxied), Rawlings should have suspected wall movement and "knew or should have known" that Toth lied on her disclosure statement.

Both Toth and Schunk argue that experts opined that the damage and wall movement could have been, or should have been, discovered via measurement by Osterhaus' inspector, Rawlings. Osterhaus infers from Rawlings' affidavit language that he should have been advised of the recency of the repairs to the west wall; otherwise, he would not have written in his report "[wall] appears to be stable." Osterhaus suggests that Rawlings' failure to include cracking as a major concern in his report was the result of defendants' failure to disclose that the repairs were recent.

We resolve this issue—of whether a reasonable inspection would have revealed the defects about which Osterhaus complains—by recalling that the district court granted summary judgment. Its memorandum decision stated that the three types of fraud claims—fraud, fraud by silence, and negligent misrepresentation—were rejected for failure to show reliance because of the buyer's acknowledgment and agreement in paragraph 5 not to rely upon the seller's disclosure statement. Admittedly the decision then provides: "Moreover, Osterhaus obtained an independent inspection which identified 'major cracking' in the basement wall." Unfortu-

nately, the memorandum decision does not elaborate on this particular observation or attempt to explain how, if at all, it figures in the rationale and holding.

Under these circumstances, we cannot conclude that summary judgment was appropriate on this basis of identification of "major cracking." Or, if it turns out that summary judgment was not granted by the district court on this basis, we cannot independently now conclude that our deciding this issue as a matter of law on this record is appropriate. *Warner v. Stover*, 283 Kan. 453, 455-56, 153 P.3d 1245 (2007) (" '[W]here we find that reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' ").

*Brennan* is of guidance on whether house defects were discoverable after inspection. There, the buyers discovered water and mold on a study carpet and water on a closet floor in the basement before closing. After some seller action to repair these leaks and after the transaction's closing, the buyers experienced water infiltration in an interior wall. A process of destructive testing revealed significant infiltration through the exterior of the house and through the walls, including where the deck joined the house. Roughly 1 month after closing, the sellers, for the first time, disclosed to the buyers a professional engineer's report concerning four water leak areas in the house. The report noted that destructive testing would have to be completed in order to pinpoint the exact location of the leak. The sellers spent approximately $4,500 on repairs. By contrast, the buyers spent more than $500,000 to resolve the water infiltration problems.

The buyers alleged fraud and negligent misrepresentations, claiming the seller failed to disclose several material facts, including the professional engineer's report. In relevant part, the *Brennan* panel stated:

"The Kunzles conducted a number of inspections, but they did not discover the defects until after taking possession of the house. Moreover, the Kunzles presented evidence that the defects were not discoverable through reasonable inspections. *The reasonableness of the Kunzles' inspections was a question of fact.* ' "It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law." ' [Citation

omitted.] Because more than one conclusion can be drawn from the same evidence, the trial court erred in determining as a matter of law that the Kunzles failed to establish a genuine issue of material fact as to whether the defects could have been discovered had the Kunzles hired 'professional inspectors to look at the water related items.' *The determination of whether the defects were discoverable through a reasonable inspection was a function of the trier of fact.* [Citation omitted.]" (Emphasis added.) 37 Kan. App. 2d at 386.

Moreover, Toth allegedly sealed the evidence of the wall damage and moved her personal items to cover the west wall. To the extent Osterhaus also is essentially arguing that he therefore was fraudulently prevented from making "a full, fair, and complete examination of the property," we note that the existence of fraud is also a question of fact. *Alires,* 277 Kan. at 403, 411. On summary judgment, we generally do not resolve factual questions. See *Warner,* 283 Kan. at 455 (trial court required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought).

We reject the defendants' arguments that, as a matter of law, Osterhaus could not have relied upon the representations. Summary judgment was incorrectly entered on their behalf.

Issue 2. *The "as is" and release provisions in the form Amendment do not bar Osterhaus' claim for breach of contract.*

Toth, Schunk, and TopPros next alternatively argue they are entitled to summary judgment on Osterhaus' breach of contract claim because the form Amendment to the sales contract captioned "Resolution of Unacceptable Conditions" contains an "as-is" provision. More specifically, paragraph 2.c on the form Amendment provides in relevant part that "[b]y closing the transaction, Buyer accepts the Property in its present 'as is' condition." Paragraph 2.d also states in relevant part that "Sellers and Realtors are released from any further obligation or liability related to the condition of the Property."

Osterhaus responds that the "as-is" provision is limited to the unacceptable conditions outlined by the buyer. He contends that this limiting provision does not make the entire contract an "as-is" contract but rather is one of several options a buyer has when dealing with unacceptable conditions discovered after an inspec-

tion. The district court specifically declined to address this issue in its ruling on the summary judgment motions.

The "as-is" clause must be read in context. *Decatur County Feed Yard, Inc.*, 266 Kan. at 1005 (cardinal rule of contract construction requires court to construe all provisions together and in harmony rather than in isolation); *Cf. Southwestern Bell Tel. Co. v. Beachner Constr. Co.*, 289 Kan. 1262, 1270, 221 P.3d 588 (2009) (provisions of an act must be construed *in pari materia* in an effort to make all provisions consistent, harmonious, and sensible). The form Amendment gives the buyer several options for dealing with unacceptable conditions and memorializes the methods for resolving them. The buyer may accept the property "as is," *i.e.*, without seller action correcting the unacceptable conditions (paragraph 1); agree to change the purchase price (paragraph 2.a); agree to accept payment or credit in lieu of correction of the unacceptable conditions (paragraph 2.b); or agree with the seller that certain conditions will be corrected (paragraph 2.c). In this case, Osterhaus agreed through paragraph 2.c that Toth would pay $900 of Osterhaus' closing costs in lieu of making the corrections to the three identified unacceptable conditions, none of which concerned the basement: electric, chimney, and insulation.

The Amendment clearly deals with the issue of unacceptable conditions revealed by a buyer's inspection. We observe that the Amendment expressly provides at the outset: "THIS AGREEMENT IS FOR DOCUMENTING THE METHOD OF RESOLVING ANY UNACCEPTABLE CONDITIONS *REVEALED BY BUYER'S INSPECTION* AND WHICH WERE THE BASIS OF BUYER'S OFFER TO RENEGOTIATE. . . ." (Emphasis added.) Accordingly, it provides in the next paragraph, "THE AGREEMENT(S) SET FORTH IN THIS AMENDMENT CONSTITUTE THE ENTIRE AGREEMENT BETWEEN THE BUYER AND SELLER WITH RESPECT TO RESOLUTION OF THE UNACCEPTABLE CONDITIONS IDENTIFIED IN BUYER'S OFFER TO RENEGOTIATE," and that had been revealed by the buyer's inspection.

In the same fashion, paragraph 1 provides in relevant part: "BUYER AGREES TO ACCEPT PROPERTY 'AS IS.' *Buyer con-*

*ducted inspections, found unacceptable conditions* and notified Seller of Buyer's desire to renegotiate the Contract." (Emphasis added.) Similarly, paragraph 2 provides: "RESOLUTION OF UN-ACCEPTABLE CONDITIONS: *Buyer conducted inspections, found unacceptable conditions* and notified Seller of Buyer's desire to renegotiate the Contract." (Emphasis added.)

Although the defendants are accurate in their references to the Amendment language, the Amendment is clearly based upon the premise that defects have been discovered during the buyer inspections and that, at least initially, they have been identified to the seller for possible resolution. The language from subparagraphs c and d of paragraph 2 follow that main paragraph's prefatory, captioned language: "RESOLUTION OF UNACCEPTABLE CONDITIONS." The options in the Amendment break down when, as here, for whatever reason, Osterhaus' inspection apparently did not reveal the defects in the foundation in order for them to be identified as unacceptable conditions. Accordingly, the "as-is" language does not extend to the foundation problems and does not preclude Osterhaus' claim for breach of contract.

We remand to the district court to make factual findings as to whether a reasonable inspection would have revealed the defects in the foundation such that they should have been included as unacceptable conditions by Osterhaus in the form Amendment.

*Issue 3: Whether Osterhaus' claims for fraud and negligent misrepresentation are barred by the 2-year limitations period is a fact question.*

Toth, Schunk, and TopPros argue an alternative basis for upholding their summary judgment on Osterhaus' claims for fraud, fraud by silence, and negligent misrepresentation. Specifically, they argue these claims are barred because they were not filed within 2 years as required by K.S.A. 60-513(a)(3) and (a)(4). The district court specifically declined to address this issue in its ruling on the summary judgment motions.

Under K.S.A. 60-513(a)(3), fraud causes of action "shall not be deemed to have accrued until the fraud is discovered." Defendants contend that Osterhaus learned that Toth's disclosure contained

misrepresentations during his inspection with Rawlings on August 3, 2002. Because Osterhaus' petition was not filed until August 11, 2004, defendants contend that his claims are time-barred.

Osterhaus counters with the plain language of K.S.A. 60-513(b):

"Except as provided in subsections (c) and (d), the causes of actions listed in subsection (a) [*e.g.*, fraud] shall not be deemed to have accrued until the act giving rise to the cause of action first causes substantial injury, *or, if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the injured party.*" (Emphasis added.)

Osterhaus contends that he could not have suffered any damages until the transaction was completed—the closing date was August 20, 2002—and a fact question remains on when the injury was "reasonably ascertainable." He cites *Gilger v. Lee Constr., Inc.*, 249 Kan. 307, 322, 820 P.2d 390 (1991), to argue that the determination of when the substantial injury became reasonably ascertainable is a question of fact for the jury. There, a family sued after it allegedly became ill because of an improperly vented furnace. This court held that summary judgment was improperly granted because a genuine issue of material fact existed as to when the family reasonably ascertained it suffered substantial injuries caused by the defendants' negligence.

*Gilger* discussed, and distinguished, several cases in which summary judgment was sustained on the issue of reasonable ascertainability. See, *e.g.*, *Friends University v. W.R. Grace & Co.*, 227 Kan. 559, 608 P.2d 936 (1989). For many of the same reasons we explained in Issue 1, however, we agree with Osterhaus. For example, whether a reasonable inspection would have revealed the defects about which he complains, and whether those defects would cause the later basement leaking, are questions of fact. See, *e.g.*, *Brennan*, 37 Kan. App. 2d at 386 (determination of whether the defects were discoverable through a reasonable inspection was a function of the trier of fact).

In short, this issue involves a question of fact that was not resolved by the district court, and we are unable to resolve on appeal. Accordingly, we remand to the district court for a determination

of when the fact of injury was reasonably ascertainable by Osterhaus.

Issue 4: *Whether Toth was a "supplier" under the KCPA is a fact question.*

Toth next argues that no claims could be brought against her under the KCPA because she is not a "supplier," as required by the Act. K.S.A. 50-624(j) defines "supplier" as "a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer." The district court, however, had ruled Osterhaus could not be an aggrieved consumer because he had no legal right to enforce at law due to his waiver of his right to rely on Toth's representations.

Interpretation of the KCPA requires an additional set of review standards for us to consider. "Interpretation of a statute is a question of law, . . . and our review is unlimited. Accordingly, when determining a question of law, we are not bound" by the trial court's interpretation of a statute. *Schmidtlien Electric, Inc. v. Greathouse,* 278 Kan. 810, 819, 104 P.3d 378 (2005). " ' "When construing a statute, a court should give words in common usage their natural and ordinary meaning." ' " 278 Kan. at 822.

Osterhaus alleges that Toth's numerous real estate transactions—seven—over a 2½-year period qualify her as a "supplier" under the KCPA. He argues that under *Heller v. Martin,* 14 Kan. App. 2d 48, 51, 782 P.2d 1241 (1989), Toth is a supplier because she is "a person engaged in the buying and selling of real estate for her own account." Osterhaus further contends this is a factual determination to be made by the district court.

Toth distinguishes herself from the seller of a home who was found to be a supplier in *Heller,* pointing out that its seller was a real estate agent. Toth also corrects Osterhaus' misstatement regarding the number of real estate transactions in which she had engaged over a short period of time. She claims that she only bought and sold three homes in 2½ years and that she lived in each home.

We agree with Osterhaus that whether Toth is a supplier is a factual question to be decided in the district court. One element of this determination is Toth's intent behind the sales of her real estate. *Cf. Brown v. United Methodist Homes for the Aged*, 249 Kan. 124, 134, 815 P.2d 72 (1991) (intent of contracting parties is normally a question of fact for the jury). To be a supplier under the KCPA, Toth must be a seller who engages in consumer trans-actions in the ordinary course of business. Under *Heller*, the district court may determine if "[h]er ordinary business was solicitation of real estate sales." 14 Kan. App. 2d at 51. As that court held, "It is also immaterial that the subject residence was owned by her and that, as its owner, she was its seller." 14 Kan. App. 2d at 51. Ac-cordingly, we remand this issue to the district court.

*Issue 5: The district court erred in granting summary judgment against Osterhaus on the negligent misrepresentation claim under BRRETA.*

Osterhaus has argued that agent Schunk had actual knowledge that contradicted the omissions from, and the false statements con-tained in, Toth's disclosure statement and which was also not dis-closed in the inspection report by Osterhaus' inspector, Rawlings. He has contended that under the Brokerage Relationships in Real Estate Transactions Act (BRRETA), K.S.A. 58-30,101 *et seq.*, Schunk also had a duty to disclose this actual knowledge to Oster-haus personally or through his agent. Schunk's knowledge allegedly included the deliberately concealed evidence of the severe damage, the recency of the basement wall repairs, and especially the move-ment of the west foundation wall. The latter was contained in the inspection report of the initial purchaser, Tomlinson, and stated in relevant part: "Basement walls have cracks and west wall appears to have moved 1¼-1½ inches."

On appeal to this court, Schunk responds that he provided the Tomlinson report to Osterhaus' agent, although the agent testified she did not recall his ever telling her about the report, Tomlinson's contract cancellation, or the foundation problems in the basement. In the alternative, Schunk contends he had no duty to disclose information from Tomlinson's inspection because it was not omit-

ted from or contradictory to any information contained in Osterhaus' own inspection report. In support of this argument, Schunk explains that Osterhaus' engineering expert, David Hobbs, testified that "seeing the kind of cracks that were noted by The Inspection Company on the west wall of the basement, would cause him as a home inspector to suspect wall movement and to make measurements of the wall or otherwise investigate further to help verify such movement."

As a seller's agent, Schunk can be held liable for negligent misrepresentation under BRRETA. The relevant provisions are K.S.A. 58-30,106(d)(3) and (4), which state:

"(3) Except as provided in subsection (d)(4), a seller's or landlord's agent is not required to disclose to a client or customer information relating to the physical condition of the property if a written report regarding the physical condition of the property has been prepared by a qualified third party and provided to the client or customer.

"(4) A seller's or landlord's agent shall disclose to the client or customer any facts actually known by the licensee that were *omitted from or contradict any information included in a written report* described in subsection (d)(3)." (Emphasis added.)

Additionally, K.S.A. 58-30,111(c) provides:

"A statutory agent or transaction broker shall not be liable for an innocent or negligent misrepresentation in information provided to the seller or landlord or to the buyer or tenant *if the licensee does not have personal knowledge of the error, inaccuracy or omission that is the basis for the claim of misrepresentation.*" (Emphasis added.)

The district court held that, "[b]ecause The Inspection Co.'s report indicated both 'major cracking' in the basement wall and that repairs had been made, Schunk had no duty to disclose this information. Therefore, Schunk and TopPros are entitled to summary judgment on Osterhaus' negligent misrepresentation claim" brought under BRRETA.

As was suggested earlier with the court's similar language rejecting other misrepresentation claims, *e.g.*, fraud, unfortunately this ruling is incomplete. It indicates that Schunk had no duty to disclose "this" information—major cracking in the basement wall and that repairs had been made. But it fails to address the possible

problems known to Schunk beyond these two issues and whether Schunk failed to disclose them. For example, the ruling is silent on whether Schunk knew of movement in the foundation walls, although he admitted having a copy of the Tomlinson report which identified this west basement wall movement of 1¼ to 1½ inches. Unquestionably wall movement was not disclosed in Osterhaus' report prepared by Rawlings of The Inspection Co. While Schunk argues he gave the Tomlinson report to Osterhaus' agent, the agent's testimony creates a genuine issue of material fact that prevents summary judgment. See *Warner*, 283 Kan. 453, Syl. ¶ 4.

Although Osterhaus' own engineering expert seems to suggest that Rawlings should have discovered the wall movement during the inspection and included it in his report to Osterhaus, the simple fact remains that it was not included. Moreover, the reasonableness of Rawlings' inspection is for the trier of fact. See *Brennan*, 37 Kan. App. 2d at 386. Finally, an expert's opinion is not necessarily dispositive of the issue on a motion for summary judgment. *Cf. McGinley v. Bank of America, N.A.*, 279 Kan. 426, 441-42, 109 P.3d 1146 (2005) (expert witness' opinion on the legal validity of document's exculpatory provision is not determinative of the issue).

In short, genuine issues of material fact remain concerning what information Schunk knew and what he disclosed to Osterhaus or Osterhaus' agent that were omitted from, or contradict any information included in, Rawlings' report to Osterhaus. Accordingly, we remand this issue to the district court for determination.

Issues 6-9: *Remaining issues raised by the parties.*

*Osterhaus' motion to amend the petition*

On October 10, 2006, Osterhaus filed a motion for leave to amend his petition, seeking to add a claim for punitive damages, clarify facts, and clarify his damages. He also sought to substitute Cheryl Tsiguloff for Toth, due to Toth's incapacitation, and to add a cause of action for rescission based on Toth's alleged dementia. The district court did not directly rule on the motion. At the October 20, 2006, hearing on the motion for summary judgment, counsel for Schunk asked about Osterhaus' pending motion to amend. The court explained that it was granting summary judg-

ment and encouraged the parties not to waste time continuing discovery or other work on the case pending appeal. As a result, it apparently found that the issue was moot.

Osterhaus argues that the district court abused its discretion in effectively denying his motion to amend his petition. We acknowledge that appellate courts review a district court's decision whether to amend a petition to claim punitive damages for abuse of discretion. K.S.A. 60-209(g); K.S.A. 60-3703; *Lindsey v. Miami County National Bank*, 267 Kan. 685, 689, 984 P.2d 719 (1999); see also K.S.A. 60-215(a); *Johnson v. Board of Pratt County Commr's*, 259 Kan. 305, 327, 913 P.2d 119 (1996) (district court given broad discretionary power under 60-215 to permit amendment of pleadings but appellate court will not find reversible error unless amendment allowed or denied is so material it affects the substantial rights of the adverse party). But because the district court did not directly address the issue, this court does not have any factual findings or legal conclusions to review. See *State v. Thomas*, 288 Kan. 157, 161, 199 P.3d 1265 (2009) (appellate courts do not make factual findings but review those made by district court). Accordingly, we remand this issue to the district court for consideration.

*Osterhaus' fraud and breach of contract claims*

Toth argues that Osterhaus must show his claims for fraud caused damages beyond those caused by the breach of contract in order to bring both causes of action. She asserts that the claims and requested damages are the same for Osterhaus' fraud claims as they are for his breach of contract claim.

In Osterhaus' motion, he sought leave to amend his petition to add claims for punitive damages, substitute parties, and clarify some of his claims, including the factual basis and the damages sought. Because we do not yet know whether the district court will allow Osterhaus to amend his petition on remand, we cannot presently determine whether Osterhaus' fraud claims are identical to those for breach of contract. As a result, we do not reach Toth's argument on appeal.

*Points not raised before the panel*

Schunk argues that the Court of Appeals panel erred in failing to sustain summary judgment to TopPros because TopPros did not formally exist until 20 months after the transaction between Osterhaus and Toth closed. However, Schunk's brief simply had stated: "Finally, some 20 months *after* Defendant Toth and The Plaintiff closed on the purchase of the subject house, Defendant Top Pros Real Estate, Inc. was incorporated and came into existence." Schunk did not otherwise brief the issue or raise it at argument. Points raised only incidentally in a party's brief but not argued in the brief are deemed abandoned. *State v. Mattox,* 280 Kan. 473, 492, 124 P.3d 6 (2005); *Enlow v. Sears, Roebuck & Co.,* 249 Kan. 732, 744, 822 P.2d 617 (1991). See also Rule 6.03(d) (2010 Kan. Ct. R. Annot. 43) (appellee's brief shall contain the arguments and authorities relied upon).

Likewise, Schunk's argument that the panel erred in failing to dismiss Osterhaus' breach of contract claim against Schunk because he was not a party to the contract is deemed abandoned because it was not argued to the panel. See *Telegram Publishing Co. v. Kansas Dept. of Transportation,* 275 Kan. 779, 794, 69 P.3d 578 (2003) (citing *Hephner v. Traders Ins. Co.,* 254 Kan. 226, 236, 864 P.2d 674 [1993]). The same fate holds true for other arguments not raised to the panel.

Finally, we have examined the other arguments raised in the 12 briefs submitted to this court and conclude they have no merit.

*Attorney fees*

On January 19, 2011, Osterhaus filed a motion for leave to file out of time a motion for attorney fees and costs pursuant to Supreme Court Rule 7.07(b) (2010 Kan. Ct. R. Annot. 62). The rule provides that "[a]ppellate courts may award attorney fees for services on appeal in any case in which the trial court had authority to award attorney fees. . . . The motion shall be filed with the clerk of the appellate courts no later than fifteen (15) days after oral argument." Applying the standard for extensions of time found in Supreme Court Rule 5.02 (2010 Kan. Ct. R. Annot. 35) to motions under Rule 7.07, we have stated that "[n]o extension will be

granted except on stated grounds reasonably indicating the necessity therefor." See *Evenson Trucking Co. v. Aranda*, 280 Kan. 821, 843-44, 127 P.3d 292 (2006) (denial of untimely motion for fees that was alleging attorney inadvertence).

Osterhaus offers no explanation of the necessity for his delay in filing the motion well after oral arguments to this court. His motion is therefore denied.

The decision of the Court of Appeals is affirmed. The decision of the district court is reversed and remanded to the district court for further proceedings.