**PUBLISH**

FILED
United States Court of Appeals
Tenth Circuit

November 29, 2023

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

TEAM INDUSTRIAL SERVICES, INC.,

    Plaintiff - Appellant,

v.

ZURICH AMERICAN INSURANCE
COMPANY; WESTAR ENERGY, INC.;
ENDURANCE AMERICAN
INSURANCE COMPANY;
WESTCHESTER FIRE INSURANCE
COMPANY,

    Defendants - Appellees,

and

KELLI MOST, individually and as
personal representative of the estate of
Jesse Henson; CECILIA HENSON;
DORIAN HENSON,

    Defendants.

No. 22-3275

_____

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 2:19-CV-02710-HLT)**
_____

Nolan C. Knight, Munsch Hardt Kopf & Harr, P.C., Dallas, Texas for Appellant.

Meredith A. Webster (joined by Larry D. Fields on the brief), Kutak Rock LLP, Kansas City, Missouri for Appellee Zurich American Insurance Company.

John T. Bullock (joined by J. Eric Weslander and Kate M. Simpson on the briefs), Stevens & Brand LLP, Lawrence, Kansas for Appellee Westar Energy, Inc.

Kevin Brooks, Baker Sterchi Cowden & Rice L.L.C., Kansas City, Missouri, Manuel Mungia and Chad Schreiber, Chasnoff, Mungia, Valkenaar Pepping & Stribling, LLP, San Antonio, Texas, and Sarah R. Smith, Lewis Brisbois Bisgaard & Smith, LLP, Houston, Texas, on the brief, for Appellee Westchester Fire Insurance Company.

Brandon A. Howerton and Andrew D. Herold, Herold & Sager, Encinitas, California, on the brief, for Appellee Endurance American Insurance Company.

_____

Before **HARTZ**, **MORITZ**, and **ROSSMAN**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Plaintiff Team Industrial Services, Inc. (Team) suffered a $222 million judgment against it in a wrongful-death lawsuit arising out of a steam-turbine failure in June 2018 at a Westar Energy, Inc. (Westar) power plant. Team seeks coverage for this liability from Westar, Zurich American Insurance Company (Zurich), and two other insurance companies, arguing that it was, or should have been, provided protection by Westar's Owner-Controlled Insurance Program (OCIP) through insurance policies issued by Zurich and the two other insurers.[1] Team's claims derive from the fact that its liability for the failure at the Westar power plant arose from work that had previously been performed by Furmanite America, Inc. (Furmanite),

_____

[1] Zurich issued the primary liability policy, with Westchester Fire Insurance Company and Endurance American Insurance Company providing two layers of excess coverage. The excess-coverage policies "'followed form' to the Zurich Policy, meaning those policies were generally governed by the terms of the Zurich Policy," and the parties agree that the excess carriers need not be treated separately. Aplee. Br. at 4; *see* Aplt. Br. at 37–38.

which did have coverage under Westar's OCIP. The United States District Court for the District of Kansas granted summary judgment to Defendants, and Team appeals. Although Team vigorously presents its arguments for reversal, we are not persuaded. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I.    BACKGROUND

The relevant facts are not disputed. In 2010 Westar entered into separate Master Services Agreements (MSAs) with Furmanite and Team to perform work at the Westar power plant and other sites. Team was to perform "pre-heat and stress relieving" services and Furmanite was to perform "valve maintenance" services. *Team Indus. Servs., Inc. v. Zurich Am. Ins. Co.* (*Team Indus. Servs.*), No. 2:19-CV-02710-HLT, 2022 WL 16961237, at *2 (D. Kan. Nov. 16, 2022). Both MSAs state that Furmanite and Team are independent contractors required to procure their own liability insurance and to name Westar as an additional insured on the policies. They both also state that "Contractor shall not assign or transfer any of its rights or obligations . . . under this Contract without previous written consent of [Westar] which consent shall not unreasonably be withheld." Aplt. App., Vol. 3 at 75, 174.

In 2013 Westar instituted its OCIP, through which contractors and subcontractors could obtain insurance protection for work performed at covered locations. Westar had discretion to decide which contractors would be eligible to enroll in the OCIP. Eligible contractors had to complete enrollment forms to be considered for participation. During the time relevant to this dispute, insurance was provided by a Zurich policy, whose premiums were paid by Westar. According to

3

Zurich's policy, an enrolled contractor's "rights and duties under this policy may not be transferred without [Zurich's] written consent." Aplt. App., Vol. 15 at 5.

With permission from Westar, Furmanite submitted an application seeking enrollment in the OCIP and was enrolled in 2013. Furmanite then obtained login credentials to an online portal operated by Westar's insurance broker, Aon Risk Services Southwest, Inc. (Aon), where Furmanite was required to report payroll hours for each month. The payroll hours reported to Aon were used by Zurich to calculate the premium to be paid by Westar for the relevant policy period. Westar never made Team eligible to enroll in the OCIP, Team never submitted an enrollment application, and it was never enrolled.

In February 2016 Team's parent company acquired Furmanite's parent company. Although Team and Furmanite became "sister companies," they were distinct legal entities and never merged. In September 2017 Team and Westar executed Change Order No. 2 to the Team Contract, which, as discussed more fully below, consolidated the MSAs of Furmanite and Team, retiring the Furmanite MSA and providing that purchase orders that had been issued to Furmanite would be reissued to Team. After the execution of that change order, Team assumed Furmanite's workload at the power plant. Furmanite's insurance coverage under the Westar OCIP continued even though its service contract had been retired. *See Team Indus. Servs.*, 2022 WL 16961237, at *3 ("Westar may have submitted a 2018 re-enrollment on Furmanite's behalf. . . . The bottom line is Furmanite's coverage continued, even after it perhaps should have ended."). A Team employee used

4

Furmanite's login credentials to upload payroll hours to the Aon payroll portal, and, for a number of months beginning in June 2017, 0 hours and 0 payroll were logged in by a Team employee in Furmanite's name for every month except April 2018. The parties stipulated that the hours Team logged in under Furmanite's name for April 2018 were for work by Team unrelated to the June 2018 accident.

In the proceedings below, Team argued that it inherited Furmanite's coverage under the OCIP via Change Order No. 2 and was therefore insured for the work it performed at the power plant. In the alternative, Team requested that the court reform the Zurich policy to list Team as an insured instead of Furmanite or enforce an insurance agreement through the doctrine of promissory estoppel against Westar and Zurich. Team also argued that Westar breached a fiduciary duty by failing to provide OCIP coverage for Team. Westar and Zurich moved for summary judgment, and the district court granted both motions. *See Team Indus. Servs.*, 2022 WL 16961237, at *1. It ruled that Change Order No. 2 unambiguously retired Furmanite's MSA and left Team's MSA as the sole governing document. The court declined to reform the Zurich policy and rejected the promissory-estoppel, breach-of-contract, and breach-of-fiduciary-duty claims. We affirm.[2]

---

[2] Team also appeals the denial of its request for a declaratory judgment. Our rejection of its appeal on the other causes of action also disposes of the request for declaratory judgment, which is predicated on the same claims.

5

## II.    DISCUSSION

We review de novo a grant of summary judgment, applying the same legal standards that are to be used by the district court. *See Merrifield v. Bd. Of Cnty. Comm'rs*, 654 F.3d 1073, 1077 (10th Cir. 2011). A grant of summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On review, "[w]e examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Merrifield*, 654 F.3d at 1077 (internal quotation marks omitted). The parties do not dispute the district court's determination that Kansas law governs the substantive issues we address on appeal. We start with the claims that Zurich breached a contractual obligation to insure Team and that Westar breached a contractual obligation to continue Furmanite's OCIP coverage for the benefit of Team.

"The primary rule for interpreting written contracts is to ascertain the parties' intent." *Osterhaus v. Toth*, 249 P.3d 888, 896 (Kan. 2011). "If the terms of the contract are clear, the intent of the parties is to be determined from the language of the contract without applying rules of construction." *Id*. Whether the contractual language is ambiguous is a matter of law for courts to decide. *See Waste Connections of Kan., Inc. v. Ritchie Corp.*, 298 P.3d 250, 265 (Kan. 2013).

Team contends that the amendment to Team's MSA by Change Order No. 2 unambiguously entitles it to Furmanite's insurance coverage. We cannot agree.

6

To begin with, enrollment in Westar's OCIP does not happen automatically. Westar alone designates which contractors are eligible, and eligible contractors must apply to enroll in the program, and then be accepted by Westar, in order to receive coverage. Also, under the express terms of the Zurich insurance policy, coverage cannot be transferred without Zurich's consent. Yet Team never enrolled, or was even invited to enroll, in Westar's OCIP. Nor did Zurich ever give written approval to a transfer of coverage from Furmanite to Team. The failure to satisfy these requirements would appear to be dispositive of Team's breach-of-contract claims.

Team argues, however, that these failures were cured by Change Order No. 2, which states:

> **Note**: On February 29, 2016 Furmanite was acquired by TEAM Industrial Services, Inc. This change order will consolidate the two services contracts that Furmanite (902236) [Furmanite MSA] and TEAM (902228) [Team MSA] hold with Westar Energy and **become effective as of September 1, 2017**.
>
> Furmanite Contract 902236 will be **retired** and all pending PO's [purchase orders] under the previous FURMANITE supplier ID 0000533098 will be reissued under TEAM INDUSTRIAL SERVICES, INC., supplier ID 0000431446 to be governed by the terms & conditions of Contract 902228 [Team MSA].

Aplt. App., Vol. 2 at 294. The argument is creative, but unpersuasive.

The Change Order contains nary a mention of insurance coverage or the OCIP. There is no ambiguity in the language of the change order from which one could infer that Team would thereafter be provided insurance coverage through the Westar OCIP or otherwise.

7

Team nevertheless insists that all is resolved by the word *consolidate* in the first paragraph of the change order. It contends that consolidation of the Furmanite and Team service contracts necessarily results in coverage for Team by the insurance already provided to Furmanite. There are at least two fatal flaws in this argument.

First, neither of the consolidated MSAs provides insurance coverage. Both unambiguously state that contractors must procure and maintain their *own* liability insurance. At most, the Furmanite MSA, as amended by what the parties referred to as "Change Order No. 1" (which we quote later in this discussion) notes the possible creation of the OCIP, but that change order does not even grant permission to Furmanite to seek enrollment in the OCIP, much less provide coverage. Thus, even if Team had been assigned the Furmanite MSA, it would not thereby obtain any insurance coverage.

Second, Change Order No. 2 rendered the Furmanite MSA a nullity. It explicitly states that the Furmanite service contract is "retired." Team contends that this unambiguous declaration in the change order cannot mean what it says because such a construction would contradict the *consolidate* language earlier in the change order. We disagree. We begin with the definition of *consolidate* adopted by the district court and endorsed by both parties. The court said: "The ordinary meaning of 'consolidate' is 'to join together into one whole: unite.' Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/consolidate . . . Black's Law Dictionary defines consolidate as 'To combine or unify (separate items) into one mass or body, esp. in order to make them more effective or easier to deal with.'

Black's Law Dictionary (11th ed. 2019)." *Team Indus. Servs.*, 2022 WL 16961237, at \*7. The thrust of Team's argument is that if the two service contracts are to be made "into one whole," then the resulting whole must include the insurance coverage that had been provided to Furmanite (even though, as just discussed above, that coverage was not provided in the Furmanite MSA). But Team does not explain why the resulting whole must adopt a provision in one service contract that does not appear in the other. The short of the matter is that there are a number of ways in which the two service contracts could be consolidated so that the parties end up with a single contract. That is why the change order includes a second paragraph, which sets forth how the consolidation should be accomplished—by, among other things, retiring Furmanite's service contract. One cannot infer from Change Order No. 2 that Team was to be protected by insurance coverage previously held by Furmanite.

Team also appears to argue that it was, or should have been, covered by the OCIP because of (1) language in Change Order No. 1 to the MSA between Westar and Furmanite requiring Westar to maintain coverage for contractors participating in the OCIP and (2) language in the OCIP documents requiring Westar to give notice if coverage is being discontinued. Again, we are not persuaded.

Change Order No. 1 states: "[Westar], at its sole option and cost, reserves the right to implement an Owner[] Controlled Insurance Program (OCIP), and, except as otherwise provided herein, maintain at all times during the performance of this Contract, the insurance specified in Attachment 4, Owner Controlled Insurance Program Requirements." Aplt. App., Vol. 2 at 293. According to Team, since

Furmanite's work for Westar was insured under the OCIP and that work was then continued by Team, Westar was required to maintain coverage for that work.

This argument fails on at least two grounds. First, the Change Order does not require Westar to do anything. It says that Westar "at its sole option and cost, reserves the right to" implement an OCIP and maintain it during the contract. *Id.* Second, the insurance policy was issued for contractors, not work. Coverage under the OCIP and the Zurich policy was for work conducted by a *particular* insured contractor. It made a difference who was doing the work. No contractor could participate in the OCIP unless Westar authorized the company to submit an application for enrollment and Westar approved the application. The MSAs stated that no rights or duties under the contract could be transferred by the contractor without Westar's approval. *See* Aplt. App., Vol. 3 at 75, 174 ("Contractor shall not assign or transfer any of its rights or obligations . . . under this Contract without previous written consent of [Westar] which consent shall not unreasonably be withheld."). And the Zurich policy said that rights under the policy could not be transferred without Zurich's permission.[3] Further, Team does not explain how coverage would be implemented. Team had been performing, and would continue to

---

[3] As Appellees point out in their brief, the absence of Zurich's written consent was an independent basis for the district court's rejection of the breach-of-contract claims. *See Team Indus. Servs.,* 2022 WL 16961237, at *9, *11. But Team does not address that basis on appeal and therefore waived any challenge to those rulings. *See Rivero v. Bd. of Regents of Univ. of New Mexico*, 950 F.3d 754, 763 (10th Cir. 2020) ("If the district court states multiple alternative grounds for its ruling and the appellant does not challenge all those grounds in the opening brief, then we may affirm the ruling.").

perform, a good deal of work that had never been performed by Furmanite. Now that Team would be participating in the OCIP, would all its work be covered by the Zurich policy or just the work previously performed by Furmanite? Such potential complications are one reason why coverage would be contractor specific and not based solely on the work performed. Change Order No.1 gave Team no right to assume the insurance coverage provided to Furmanite.

As for the OCIP, the language in the program documents relied on by Team is: "In the event [Westar], for any reason, is unable to furnish or after commencement of Work or Services elects not to furnish or to continue to furnish the insurance as specified . . . and upon 30 days written notice from [Westar] the following shall be required." Aplt. App., Vol. 4 at 46. The document proceeds to state that those previously enrolled in the OCIP must obtain replacement insurance before the OCIP coverage terminates, with Westar covering the cost of additional premiums. We think it clear that the notice is to go only to contractors already covered by the OCIP, not contractors—like Team—who are not enrolled in the program.

In sum, no contractual promise by Westar or Zurich entitled Team to coverage under the OCIP. The district court properly rejected Team's claims for breach of contract.

Team's remaining claims can be readily disposed of. First, it seeks reformation of Westar's OCIP insurance policy with Zurich, claiming that it was an error by Westar "that le[]d Zurich to issue coverage in the name of [Furmanite rather than Team]." Aplt. Br. at 53. "Reformation is that remedy by means of which a written

11

instrument is made or construed to express or conform to the real intention of the parties, when some error or mistake has been committed." *Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1128 (Kan. 2002) (internal quotation marks omitted). The law of reformation recognizes that "written contracts do not always accurately reflect the parties' antecedent agreement," and is available only in instances of "mutual mistake or fraud." *Id.* (internal quotation marks omitted). "[W]hen a court determines an instrument does not reflect the terms intended by the parties to it, the court then revises the terms written in the instrument to reflect the intent of the parties." *Id.* (cleaned up). Since Zurich was necessarily one of the parties to the insurance contract, reformation would require proof that Zurich intended to insure Team. But Team provides no argument, much less evidence, that *Zurich* intended to name Team as an insured. In any event, the Zurich policy explicitly protects Zurich from such claims by requiring any transfer of coverage to be approved by Zurich in writing. Aplt. App., Vol. 15 at 5 ("Your rights and duties under this policy may not be transferred without [Zurich's] written consent."). Even if Westar made a mistake with respect to Team's coverage under the Zurich policy, reformation requires mistakes by *both* parties to the contract.

Team also contends that Westar breached a fiduciary duty imposed by the OCIP to ensure that Team was covered by the OCIP or at least provide notice to Team if it was not to be covered for the work that had been performed by Furmanite. But even if we assume that this duty imposed on Westar was a fiduciary duty, it was not, as we explained above, a duty owed to Team because Team had never been

12

covered under the OCIP. It would have been a duty owed only to Furmanite. And because we have already rejected the argument that Team inherited Furmanite's OCIP coverage, we also reject the argument that any fiduciary duty owed by Westar to Furmanite under the OCIP was automatically transferred to Team upon its assumption of Furmanite's work duties.

Finally, Team raises a perfunctory claim of promissory estoppel. Such a claim may arise if "(1) [t]he promisor reasonably expected the promisee to act in reliance on the promise, (2) the promisee acted as could reasonably be expected in relying on the promise, and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *Mohr v. State Bank of Stanley*, 770 P.2d 466, 481 (Kan. 1989). As best we can tell, Team is asserting that Westar is estopped from denying that it was to provide coverage for Team under the OCIP because of promises made to Team. First, Team incorporates its previous arguments that Change Order No. 2 constituted a promise to cover Team under the OCIP. We need not repeat why we reject that argument. Second, Team points to its reporting of payroll data through the Aon portal after Team had taken over the work previously performed by Furmanite. But there is no allegation that Westar knew about this reporting, so it could hardly have expected to induce Team's reliance. Nor was there any evidence of a promise by Zurich to provide insurance coverage to Team.[4]

---

[4] Because we rule in favor of Appellees on other grounds, we need not address their collateral-estoppel argument based on the judgment in the wrongful-death lawsuit.

13

## III.    CONCLUSION

We **AFFIRM** the judgment of the district court.